UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

RICHARD GEORGE; STEVEN LEAVITT
and SANDRA LEAVITT, and all others
similarly situated

Plaintiffs,

v.

URBAN SETTLEMENT SERVICES d/b/a
URBAN LENDING SOLUTIONS; BANK OF
AMERICA, N.A.

Defendants.

**<u>CLASS ACTION COMPLAINT</u>**


**<u>JURY TRIAL DEMANDED</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION AND VENUE ........................................................................4

III.  PARTIES ...........................................................................................................5

IV.  FACTUAL BACKGROUND.............................................................................5

     A.     The Foreclosure Crisis .........................................................................5

     B.     HAMP Was Created as a Clear, Streamlined Method for Borrowers to Modify Loans and Avoid Foreclosure ...................................................7

     C.     HAMP Eligibility.................................................................................10

     D.     BOA Used Urban to Create the Modification Denial Enterprise and a Scheme Designed to Feign Compliance with HAMP while Permanently Modifying as Few Loans as Possible ....................................................15

           1.     BOA decided it was more profitable to avoid HAMP modifications.........15

           2.     BOA and Urban fraudulently delayed and denied HAMP loan modifications........................................................................17

           3.     BOA assigned key HAMP functions to third parties such as Urban. ........22

           4.     BOA directed and encouraged Urban to fraudulently deny loan modifications........................................................................25

           5.     Urban and BOA executives knew loan modifications were being fraudulently denied and encouraged the fraud to continue........................29

           6.     Notices provided by BOA and Urban were fraudulent.............................32

     E.     BOA's Actions Caused Injury to Plaintiffs ...........................................34

     F.     BOA Has Been Recognized as the Single Worst Performing Servicer under HAMP.........................................................................................35

V.   CLAIMS OF NAMED PLAINTIFFS ..............................................................37

     A.     Steven and Sandra Leavitt ...................................................................37

B.     Richard George ........................................................................................43

VI.   CLASS ACTION ALLEGATIONS .................................................................47

A.    National RICO Class and State Classes...................................................48

VII.  EQUITABLE TOLLING, DISCOVERY RULE RE: STATUTES OF
LIMITATIONS..................................................................................................51

VIII. COUNTS............................................................................................................52

COUNT I:  BY THE NATIONAL RICO CLASS:  VIOLATION OF RACKETEER
INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(C).........52

COUNT II:  AGAINST BOA DEFENDANTS ON BEHALF OF THE STATE
CLASSES:  BREACH OF CONTRACT BASED ON PROMISSORY ESTOPPEL.......59

PRAYER FOR RELIEF ...............................................................................................60

## I.    INTRODUCTION

1.      In early 2009, Bank of America ("BOA") took more than $45 billion in government bailout money.  As a condition of receiving this bailout, BOA agreed to participate in the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  BOA signed a contract with the U.S. Treasury on April 17, 2009 agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.

2.      Though BOA accepted billions of dollars and contractually agreed to comply with the HAMP directives and extend loan modifications to eligible homeowners, BOA has systematically and deliberately worked to sabotage HAMP and to modify as few mortgages as possible according to its terms.  BOA found it was more profitable if homeowners accepted in-house modifications rather than the loan modifications mandated by the HAMP process. Consequently, BOA pushed homeowners who were applying for HAMP modifications toward more expensive in-house modifications using tactics of outright fraud.

3.      Rather than working diligently to reduce the number of loans in danger of default by establishing permanent modifications, BOA serially strung out, delayed, and otherwise hindered the modification processes that it agreed to facilitate.  BOA's delay and obstruction tactics have taken various forms with the common result that homeowners with loans BOA serviced, and who met the requirements for participation in HAMP, did not get a fair opportunity to secure a permanent loan modification through the HAMP process.

4.      To accomplish its objectives, BOA created a widespread RICO enterprise to defraud homeowners who sought modifications and then acted as the kingpin of that enterprise. BOA enlisted Defendant Urban Settlement Services (d/b/a Urban Lending Solutions, referred to hereinafter as "Urban") to act as a member of the RICO enterprise and assigned to Urban key aspects of the process of administering HAMP, including interacting with homeowners seeking HAMP modifications, collecting and processing documents from homeowners, and corresponding with homeowners. BOA and Urban worked in concert, under BOA's direction and for many years, to frustrate the HAMP process and to prevent as many homeowners as possible from obtaining permanent loan modifications that complied with HAMP while allowing BOA to maintain the appearance to regulators and the public of trying to comply with its HAMP obligations. Through this relationship and with this common goal, BOA and Urban formed an association-in-fact enterprise that was effectuated through the use of thousands of false wire and mail communications. As part of the scheme "site leaders" were told BOA would collect more money if HAMP modifications were delayed and, as such, BOA employees were instructed to delay HAMP modifications.

5.      As part of the loan-modification scheme and enterprise, homeowners seeking HAMP trial plans were directed by wire and mail instructions from BOA to send financial information directly to Urban. Consumers were led to believe that they were dealing with BOA when secretly they were communicating with Urban. As part of the loan-modification scheme and enterprise, Urban became a "black hole" for documents sent by homeowners. As part of the enterprise and scheme, BOA used the mail and wires to falsely deny modifications by claiming that information required of homeowners seeking a HAMP modification had not been received,

when in fact BOA and Urban had received the documents.  Oftentimes consumers were led to believe they were speaking with BOA's "Office of the President" when in fact they were speaking with Urban employees.  As part of the scheme Urban employees manipulated financial records to justify ending the HAMP modifications process for homeowners.

6.    Numerous former employees of both BOA and Urban report that BOA directed its employees and contractors to use the wires and mails to deliberately lie to homeowners who were in the process of trying to obtain loan modifications under HAMP.  They further report a widespread and deliberate practice of knowingly issuing false notices claiming that homeowners had failed to submit required documentation and of denying HAMP applications *en masse* for reasons they knew to be false.  These actions were taken with the full knowledge, and at the direction, of the individuals tasked with running Defendants' HAMP modification program.

7.    This scheme was conducted via interstate mail and phone lines, in thousands of documents sent via mail and overnight courier, including documents and phone calls intended to deceive borrowers into believing they would receive HAMP modifications, and letters and phone calls which were knowingly false about why borrowers were not receiving HAMP modifications.

8.    Because of the BOA-Urban loan-modification scheme, hundreds of thousands of homeowners were wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, BOA has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from BOA.

9.      On behalf of nationwide classes of borrowers, Plaintiffs state a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), alleging that Defendants created an association-in-fact enterprise designed to mislead and deceive borrowers through use of the United States mail and wires.  On behalf of the members of those classes, Plaintiffs seek declaratory relief and/or a judgment of liability.

10.     In addition, on behalf themselves and statewide classes of similarly situated borrowers, Plaintiffs state claims of promissory estoppel for representations made to them by Defendants.

## II.      JURISDICTION AND VENUE

11.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that these complaints are putative class actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are thousands of members in the proposed class and at least one member of the class of plaintiffs is a citizen of a state different from any defendant.  BOA is, on information and belief, a citizen of North Carolina.  Urban is a citizen of Pennsylvania with its main offices in Colorado.  Plaintiffs are citizens of Washington state and New Hampshire.

12.     This Court also has original federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), both because Defendant Urban has its headquarters in this District and because Defendants otherwise transact substantial business in this district.

## III. PARTIES

14. Individual and Representative Plaintiff Richard George is a resident of the state of Washington.

15. Individual and Representative Plaintiffs Steven and Sandra Leavitt are husband and wife and are residents of the state of New Hampshire.

16. Defendant Bank of America, N.A., is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255. Bank of America, N.A., performs substantial business within the state of Colorado. Bank of America N.A. has formerly done business under the name BAC Home Loans Servicing, LP, which was formerly a subsidiary of Bank of America, N.A. and is now a successor by merger.

17. Defendant Urban Settlement Services d/b/a Urban Lending Solutions is a limited liability corporation organized under the laws of Pennsylvania with main offices located in Broomfield, CO and which does business throughout the United States.

18. At all times herein mentioned, Defendants Bank of America, N.A., and BAC Home Loans Servicing, LP, both individually and collectively, are and were agents and/or joint ventures of each other and, in doing the acts alleged herein, were acting within the course and scope of such agency. Collectively, these Defendants are referred to in this Complaint as "BOA."

## IV. FACTUAL BACKGROUND

### A. The Foreclosure Crisis

19. The last fifteen years has been marked by the inflation and bursting of one of the largest asset bubbles in United States history. After U.S. home prices increased by 132 percent

from the first quarter of 1997 to the second quarter of 2006 (an average annual increase of 9.5

percent), U.S. home prices decreased by 35 percent from the second quarter of 2006 to the first

quarter of 2012 (an average annual decrease of 7.1 percent).[1]  Over the same time period of the

home price collapse, unemployment increased from 4.6 percent at the end of the second quarter

of 2006 to 8.2 percent at the end of the first quarter of 2012.[2]

20.     During the housing bubble, many mortgages were originated with features that

made them vulnerable to default should the economy deteriorate in conjunction with decreasing

home values.  These loan features included prepayment penalties, and adjustable rate terms with

low introductory "teaser" rates that resulted in significantly higher monthly payments once the

rates reset.[3]

21.     Countrywide Home Loans was among the most aggressive companies in

originating loans with these abusive features.  With its purchase of Countrywide in 2008, BOA

acquired hundreds of thousands of loans that were deceptively originated and that included

features that made borrowers increasingly vulnerable to default.

22.     Once the bubble burst, foreclosures skyrocketed as economic conditions created

difficulty for many borrowers in meeting their mortgage obligations (and borrowers with

negative equity in their homes were less likely to continue making mortgage payments).  Falling

housing prices made it difficult for distressed homeowners to sell or refinance their houses,

---

[1] These measures are based on the S&P/Case-Shiller U.S. National Home Price Index (available at http://us.spindices.com/indices/real-estate/sp-case-shiller-us-national-home-price-index) (accessed Mar. 24, 2013).

[2] U.S. Department of Labor, Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, http://data.bls.gov/timeseries/LNS14000000 (accessed Mar. 24, 2013).

[3] *See, e.g.*, Eric S. Belsky & Nela Richardson, *Understanding the Boom and Bust in Nonprime Mortgage Lending*, Working Paper, Joint Center for Housing Studies, Harvard University, at 38-40 (Sept. 2010); Kristopher S. Gerardi, Andreas Lehnert, Shane M. Sherland, & Paul S. Willen, *Making Sense of the Subprime Crisis*, Working Paper 2009-02, Federal Reserve Bank of Atlanta, at 78-84 (Feb. 2009).

especially if they had negative equity.  The Center for Responsible Lending estimates that 6.4

percent of all mortgages originated from 2004 to 2008 were already lost to foreclosure as of

February 2011.[4]  Another 8.3 percent of all loan originations made from 2004 to 2008 were at

least 60 days delinquent or in the foreclosure process as of February 2011.[5]

**B.      HAMP Was Created as a Clear, Streamlined Method for Borrowers to Modify Loans and Avoid Foreclosure**

23.      In response to this foreclosure crisis, the federal government developed the

Making Home Affordable ("MHA") program. HAMP was developed as a part of MHA to help

keep homeowners in their homes by incentivizing mortgage servicers to modify the loan terms

for borrowers who were delinquent or in danger of becoming delinquent on their loans.

24.      When President Obama announced HAMP on February 18, 2009, he described it

as a plan to eliminate a "maze of rules and regulations" in which homeowners rarely find

answers, and in which "your ability to restructure your loan depends on where you live, the

company that owns or manages your loan, or even the agent who happens to answer the phone

on the day that you call."  The president announced that HAMP "establishes clear guidelines for

the entire mortgage industry that will encourage lenders to modify mortgages on primary

residences.… This will enable as many as 3 to 4 million homeowners to modify the terms of

their mortgages to avoid foreclosure."  The president described the shared responsibility under

HAMP as follows:

---

[4] Debbie Gruenstein Bocian, Wei Li, & Carolina Reid, Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures*, at 14 (Nov. 2011) (available at http://www.responsiblelending.org/mortgage-lending/research-analysis/Lost-Ground-2011.pdf).

[5] *Id.*

> So this part of the plan will require both buyers and lenders to step up and do their part, to take on some responsibility. Lenders will need to lower interest rates and share in the costs of reducing monthly payments in order to prevent another wave of foreclosures. Borrowers will be required to make payments on time in return for this opportunity to reduce those payments.[6]

25.     The HAMP program is administered by the U.S. Treasury Department ("Treasury"). All banks participating in the Troubled Asset Relief Program ("TARP") were required to participate in HAMP, while other banks could participate voluntarily.[7] BOA accepted over $45 billion in TARP bailout money.[8] BOA thus signed a "Servicer Participation Agreement" with Treasury to participate in HAMP at its outset in April 2009.[9] As with all participating servicers, BOA was required to solicit certain borrowers to apply for HAMP assistance.[10]

26.     HAMP was designed to enhance the incentives of mortgage loan investors and servicers to modify loan terms to lower monthly payments. By modifying the loan, investors (and servicers) would initially receive lower payment cash-flows than they would have received under the original mortgage contract, but the likelihood of the borrower defaulting on the loan

---

[6] Remarks by the President on the Home Mortgage Crisis, February 18, 2009; available at http://www.whitehouse.gov/the-press-office/remarks-president-mortgage-crisis

[7] Kristopher Gerardi & Wenli Li, *Mortgage Foreclosure Prevention Efforts*, 95 FED. RESERVE BANK OF ATLANTA ECON. REV., No. 2, at 6 (2010).

[8] Office of the Special Inspector General for the Troubled Asset Relief Program, *Initial Report to the Congress*, Feb. 6, 2009, http://www.sigtarp.gov/Quarterly%20Reports/SIGTARP_Initial_Report_to_the_Congress.pdf, at 70.

[9] *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement,* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Documents_Contracts_Agreements/093010bankofamericahomeloansSPA(incltransmittal)-r.pdf; *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement,* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Documents_Contracts_Agreements/Bank%20of%20America%20NA.pdf

[10] U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 10-02,* Mar. 24, 2010 ("SD 10-02"), at 2-3.

- 8 -

would decrease and the costs of foreclosure to borrowers, investors, servicers, and to communities could be avoided.

27.     Treasury's regular evaluations of HAMP performance demonstrate the significant benefits to borrowers who receive HAMP modifications.  As of June 2010, Treasury reported that 100 percent of permanent modifications featured an interest rate reduction, 56 percent had term extensions, and 29 percent included principal forbearance.[11]  The median monthly principal and interest payment was reduced 41 percent for modified loans, from $1,422 to $838.[12]  By the end of 2012, Treasury reported that homeowners in permanent HAMP modifications for all servicers had saved an estimated $17.3 billion in monthly mortgage payments.[13]  Borrowers receiving HAMP modifications also realized a lower likelihood of re-default than borrowers receiving other types of modifications.[14]

28.     Treasury requires Participating Servicers to evaluate *all loans* that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria.  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect

---

[11] U.S. Department of Treasury, Making Home Affordable Program Servicer Performance Report through June 2010 (Aug. 6, 2010), at 3.

[12] *Id.*

[13] U.S. Department of Treasury, Office of Financial Stability, Troubled Asset Relief Program: Four Year Retrospective Report, An Update on the Wind-Down of TARP (Mar. 2013), http://www.treasury.gov/initiatives/financial-stability/reports/Documents/TARP%20Four%20Year%20 Retrospective%20Report.pdf, at 21.

[14] Office of the Comptroller of Currency, OCC Mortgage Metrics Report, Disclosure of National Bank and Federal Savings Association Mortgage Loan Data, Third Quarter 2012 (Dec. 2012), http://www.occ.gov/publications/publications-by-type/other-publications-reports/mortgage-metrics-2012/mortgage-metrics-q3-2012.pdf, at 39, 44.  Following the HAMP modifications implemented between the third quarter of 2009 and the second quarter of 2012, 8.5 percent were either in the foreclosure process or had completed foreclosure at the end of September 2012, compared with 14.8 percent of non-HAMP modifications over the same time period.  *Id.* at 44.

- 9 -

income and hardship information to determine if the borrower is eligible for a HAMP

modification.[15]

## C.    HAMP Eligibility

29.     The modification process consists of two stages.  In the first stage, the servicer

collects and evaluates information from the borrower and from its own records.  If the borrower

meets specific eligibility guidelines for a HAMP modification, the servicer is required to offer

the borrower a Trial Period Plan.[16]  As described in the Trial Period Plan itself, the servicer then

has the three-month trial period to verify that initial information.[17]

30.     During this first stage of the HAMP modification, before offering the Trial Period

Plan, the servicer must evaluate whether the borrower meets specific eligibility guidelines for a

HAMP modification:[18]

- The home must be an owner-occupied, single-family 1-to-4 unit property;

- The home must be a primary residence;

- The home must not be vacant or condemned;

- The home's first-lien mortgage must not have an unpaid principal balance

   exceeding $729,750 (with higher limits for multiple-unit properties);

- The home mortgage was not previously modified under HAMP;

---

[15] SD 09-01 at 2-4.

[16] See U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 09-01*, Apr. 6, 2009 ("SD 09-01"), at 2.  For ease of reference, in this Complaint, "Trial Period Plan" generally refers to all trial-payment agreements or plans issued by BOA and Urban pursuant to HAMP.

[17] *Id.* at 5-6.

[18] See U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 09-01*, Apr. 6, 2009 ("SD 09-01"), at 2.

- The mortgage is currently 60+ days delinquent, default is "reasonably foreseeable," or the mortgage is in foreclosure;

- The borrower has submitted a Hardship Affidavit documenting a borrower's financial hardship; and

- The borrower's monthly payment, including principal, interest, taxes, and insurance ("PITI") prior to the modification, is greater than 31 percent of the borrower's monthly income.[19]

31.     After using available information provided by the borrower and drawn from its own files, the servicer determined if each of these threshold requirements is met.  Further, using that same information, the servicer evaluated borrower's eligibility at this stage via the waterfall and NPV processes (described in more detail below).  If, on the basis of that information, the homeowner qualified for a HAMP modification, through these processes, the servicer would then offer the homeowner a Trial Period Plan.[20]  As described in the Trial Period Plan itself, the servicer then had the three-month trial period to verify that initial information.[21]

32.     If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a Trial Period Plan Agreement if the modification provides a net present benefit to the mortgage holder.  This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior to the tender of a Trial Period Plan Agreement.

---

[19] Mortgage insurance premiums and payments related to second lien loans are not included in the monthly payment for this calculation.  *Id.* at 6.

[20] SD 09-01, at 5, 17-18.

[21] *Id.* at 5-6.

- 11 -

33.     If the homeowner complies with the Trial Period Plan's written requirements (including making all monthly Trial Period Plan payments), and the servicer's verification process revealed no variations in the verified information outside of HAMP parameters, then the second stage of the HAMP process is triggered, requiring an offer of a permanent modification.

34.     Servicers are restricted from initiating foreclosure or continuing previously initiated foreclosure processes against any properties with loans that are eligible for HAMP but (i) have not been evaluated, (ii) are in the evaluation process, or (iii) are in an active Trial Period Plan.[22]  The servicer must also coordinate with the mortgage insurer on the HAMP modification process for loans with mortgage insurance.[23]

35.     At the outset of HAMP in 2009, BOA used a standard form agreement to offer Trial Period Plans to eligible homeowners.  This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.  This Trial Period Plan was intended to, and did, induce homeowners to make trial payments and to expect that they would receive a permanent modification once they made all trial payments on time.  However, as described at length below, pursuant to their loan-modification scheme and enterprise, BOA and Urban intended to deny modifications to the vast majority of borrowers even if they complied with all the requirements set forth in the Trial Period Plans.

---

[22] *Id.* at 14; U.S. Department of Treasury, *Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 4.1* (Dec. 13, 2012), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_41.pdf ("HAMP Handbook v4.1"), at 86-88.

[23] *Id.* at 14.

36.     In March 2010, Treasury revised the process by requiring servicers to verify all financial information before issuing a Trial Period Plan to a borrower seeking a HAMP modification.  Though BOA had required homeowners to submit financial documents before receiving a trial-payment agreement from the outset, BOA took this opportunity to revise its formal policies and to revise the form Trial Period Plan it used going forward.  In response to several court decisions that found the form Trial Period Plan that BOA used constituted a contract, in approximately July 2010, BOA began using a form Trial Period Plan that included more conditional language.  Nevertheless, the form Trial Period Plan used after July 2010 was intended to, and did, induce homeowners to make trial payments and to expect that they would receive a permanent modification once they made all trial payments on time.  However, as described at length below, pursuant to their loan-modification scheme and enterprise, BOA and Urban intended to deny modifications to the vast majority of borrowers even if they complied with all the requirements set forth in the Trial Period Plans.

37.     The goal for a HAMP modification is to reduce borrower's total payment (including principal, interest, taxes, insurance, and association fees) to 31 percent of their current income for a five-year period.[24]  To determine the loan modification and associated incentives that must be offered under HAMP to achieve this goal, participating servicers must use a "waterfall" procedure to determine the loan terms for the potential final modification.  Specifically, the standard waterfall procedure works as follows:[25]

---

[24] SD 09-01, at 8-9.

[25] *Id*. at 9-10.

- *Interest Reduction*:  First, reduce the interest rate in 0.125 percent increments as needed (to a rate no lower than two percent) by re-amortizing the outstanding balance over the remaining life of the loan.[26]

- *Term Extension*:  Second, if the Debt-to-Income ("DTI") remains above 31 percent at a two percent interest rate, extend the remaining term of the loan up to a maximum of 480 months from the Modification Effective Date ("MED"), to the extent allowed by existing servicing agreements.[27]

- *Principal Forbearance*:  Third, if the DTI remains above 31 percent after calculating the first two steps, shift the necessary amount of principal necessary to achieve 31 percent DTI to a non-interest bearing balloon payment.[28]  The amount of this balloon payment is termed the principal forbearance because the servicer forebears earning interest on this principal amount.

38.    After five years, the interest rate on the modified loan may increase up to one percent per year until it reaches the lower of the pre-existing note rate or a market-based rate.

---

[26] The outstanding balance includes arrearages such as past due interest, out of pocket and pending escrow payments, and servicing fees that are not related to the modification.  *Id*. at 9; HAMP Handbook v4.1, at 104.  Late fees may not be capitalized and must be waived if the borrower satisfies all conditions of the Trial Period Plan.  SD 09-01, at 9.

[27] For HAMP trial modifications, the Modification Effective Date "is the anticipated Modification Effective Date of the official loan modification.  This is the first day of the month following the month when the last trial payment is due."  U.S. Department of Treasury, *HAMP Data Dictionary - 04/01/2013 Release*, https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/hampdatadictionary04012013.xls.

[28] Effective January 28, 2010, the amount of principal forbearance required is limited to the greater of 30 percent of the unpaid principal balance or an amount that would result in a mark-to-market LTV of 100 percent. U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 10-01*, Jan. 28, 2010 ("SD 10-01"), at 6.  The balloon payment is due at the earlier of (i) the maturity of the loan, (ii) transfer of the property, or (iii) payoff of interest-bearing unpaid principal balance.  SD 09-01, at 10.

**D.**     **BOA Used Urban to Create the Modification Denial Enterprise and a Scheme Designed to Feign Compliance with HAMP while Permanently Modifying as Few Loans as Possible**

  **1.**     **BOA decided it was more profitable to avoid HAMP modifications.**

  39.     Under HAMP, the government incentivizes participating servicers by paying $1,000.00 for each HAMP modification.  However, this incentive is countered by financial factors that make it more profitable for BOA to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure.  This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by BOA because BOA does not carry a significant risk of loss in the event of foreclosure.

  40.     Economic factors that discourage BOA from meeting its obligations under HAMP by facilitating loan modifications include the following:[29]

- BOA may be required to repurchase loans from the investor in order to permanently modify the loan.  This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that BOA, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool.  Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that BOA charges borrowers that are in default constitute a significant source of revenue.  Aside from income BOA receives directly, late fees and

---

[29] *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

"process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

41.     Former BOA employees have confirmed that BOA pressured them as a matter of policy to delay HAMP modifications in order to maximize fees for BOA. According to Simone Gordon, a former BOA Senior Collector of Loss Mitigation, BOA supervisors, known as "site leaders," regularly told the employees and "team leaders" they supervised that the more they delayed the HAMP modification process, the more fees BOA would collect. Employees were regularly drilled that it was their job to maximize fees for BOA by fostering and extending delay of the HAMP modification process by any means they could – this included by lying to customers.

42.     Another former BOA employee, William Wilson, who worked as an underwriter and was promoted to supervise a team of "Case Relationship Managers," testified that BOA

fostered HAMP delays in order to push homeowners into in-house modifications that were more profitable for BOA.  This former supervisor testified that BOA underwriters, Case Relationship Managers, and other employees were instructed by their respective supervisors to delay requests for HAMP modifications and then to push homeowners to accept an internal refinance so that Bank of America would profit.  Once an applicant was finally rejected after a long delay, the bank would offer them an in-house alternative.  Bank of America would charge a higher interest rate, ranging up to 5%, as compared to the 2% if the loan had been modified under HAMP.

43.     BOA knew that these procedures were contrary to the HAMP requirements to which it promised to adhere as a condition of accepting $45 billion in taxpayer bailout money.  It also knew that its procedures were contrary to the representations made to borrowers, including representations in the Trial Period Plans sent to borrowers.

## 2.     BOA and Urban fraudulently delayed and denied HAMP loan modifications.

44.     Former BOA and Urban employees have confirmed that BOA is not complying with HAMP in a manner that can only be considered deliberate.  BOA's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications.  Instead, BOA has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

45.     Former BOA and Urban employees recount that their supervisors instructed them to lie to customers and claim that BOA had not received documents it had requested, and that it had not received trial payments (when in fact it had).  For example, former employee Simone Gordon and her co-workers were repeatedly told by their supervisors that admitting that BOA received documents would "open a can of worms" since BOA was required to underwrite the

- 17 -

loan modification within 30 days of receiving those documents, and it did not have sufficient underwriting staff to complete the underwriting in that time.  Former BOA underwriter and supervisor William Wilson confirmed that BOA underwriters had a backlog of files so large that they could not possibly complete underwriting within 30 or even 100 days of receiving a package of documents from any given homeowner.  A former high-level BOA executive has described BOA's underwriters as being grossly overloaded to the point that they could not have been expected to perform effective or accurate underwriting.

46.     Steven Cupples is a former BOA underwriter who started with Countrywide in 2006 and was retained as a BOA employee when BOA bought Countrywide.  BOA later promoted him to supervise a team of BOA underwriters.  Mr. Cupples was among the first BOA employees to work on HAMP-related modifications and worked on the program in several different capacities including underwriting, data analysis, and internal quality assurance.  Mr. Cupples has testified that it was clear that BOA had not dedicated even the most basic levels of staff and resources it knew it would need to keep up with the volume of HAMP loan modifications.  BOA executives including Rebecca Mairone, John Berens, and Patricia Feltch were repeatedly made aware of some of the most obvious shortcomings in BOA's processes and performance.  According to Mr. Cupples, despite BOA's executives having full knowledge of these problems, BOA made no substantial efforts to fulfill its obligations under HAMP in anything that could be described as a good-faith or honest effort.

47.     Former BOA employees located in customer service centers all over the country including Simone Gordon who worked in New Jersey, William Wilson who worked in North Carolina, Theresa Terrelonge and Erika Brown who worked in Texas confirmed reports from

thousands of homeowners seeking modifications under HAMP:  customer service representatives regularly informed homeowners that modification documents were not received on time or not received at all when, in fact, all documents had been received.  Similarly, homeowners were regularly told that documents were sent on a particular date when, in fact, BOA had not sent the documents at all.  Former Urban employees including Gregory Mackler and Bert Sheeks confirmed that Urban employees disseminated similar misinformation to homeowners who thought they were speaking to BOA's "Office of the President" when, in fact, they were speaking to Urban employees.  The named plaintiffs in these matters were subjected to redundant, ambiguous and threatening demands for documents by BOA and Urban – documents that BOA and Urban knew had already been submitted, that were not required to determine eligibility under HAMP guidelines, or that were unnecessary "updates" of previous documents.

48.     BOA Site Leaders specifically ordered their employees to hold financial documents borrowers submitted for at least thirty days.  Urban employees including Gregory Mackler, a former Customer Advocate who was promoted to a position of Quality Control, and Bert Sheeks, a former document auditor, similarly described how Urban would let documents from borrowers sit and age without acting on them – all with the full knowledge of the BOA executives who were supervising Urban.  Once thirty days passed, BOA would consider many of these documents, such as pay stubs or bank statements to be "stale" and the homeowner would have to re-apply for a modification.

49.     Former BOA supervisor and longtime employee Steven Cupples testified to discovering a method Urban employed to allow BOA to prevent modifications that consisted of "scattering" homeowner documents.  Among other things, BOA tasked Urban with uploading

financial documents it received from homeowners into computer systems that BOA underwriters could then review.  Mr. Cupples recognized that Urban regularly scanned portions of document packages it received into *different* links in *various* computer systems such that the documents could not be viewed using a single system.  Consequently, it would appear to an inadequately trained underwriter, or to an outside regulator conducting an audit, that the borrower had not sent a complete packet of required documents.  BOA used this pretext to decline loan modifications to homeowners who had sent all documents required of them.

50.     After BOA and Urban had let homeowners' documents sit for a month or more, BOA would order that case managers and underwriters "clean out" the backlog of HAMP applications by denying any file in which the financial documents were more than 60 days old.  BOA termed this cleanout a "blitz," and performed it approximately twice a month.  According to former BOA supervisor Wilson, during a blitz, a single "team" of 10-15 Case Relationship Managers would decline between 600 and 1,500 modification files at a time for no reason other than that the borrower documents were more than 60 days old.

51.     BOA instructed its managers, underwriters and other employees to enter a reason into its electronic databases that would justify declining the modification it declined during a "blitz" to the Treasury Department.  Justifications commonly included claiming that the homeowner had failed to return requested documents or had failed to make payments.  In reality, these justifications were untrue and the justifications were entered with BOA's full knowledge that they were false.

52.     Former employee Theresa Terrelonge has confirmed that BOA did not properly employ the "waterfall" formula mandated by HAMP.  According to a former high-level BOA

- 20 -

executive, BOA staffed various positions with people who did not have the expertise or experience to properly perform their job duties. BOA also did not give its employees sufficient training to properly perform duties such as calculating an applicant's income for purposes of HAMP, properly applying the "waterfall" formula, or properly underwriting a loan file.

53. Former BOA employees including Theresa Terrelonge and Simone Gordon testified to seeing homeowners' financial records manipulated in BOA's computer system to the homeowners' detriment. Former Urban employees including Bert Sheeks similarly recount employees manipulating financial records in the computer systems Urban shared with BOA in order to justify ending the modification process and closing files more quickly.

54. BOA offered production goals to managers and to employees based on how many files they could "close" – meaning how many homeowners seeking loan modifications they could decline. BOA awarded employees incentives such as $25 in cash or restaurant gift cards based on the number of files they could close in a given week. On the other hand, employees who did not close a sufficient number of files were subject to discipline and possible termination. BOA placed similar production goals and requirements on Urban. Former employees including Gregory Mackler and Bert Sheeks have described the intense pressure BOA placed on Urban and that Urban supervisors placed on employees to close files as fast as possible.

55. Bank of America methodically carried out delay and rejection programs under the supervision of regional Vice Presidents and other executives including but not limited to Rebecca Mairone, John Berens, Kenneth Scheller, Troy Novotny, Patricia Feltch, and Tyrone Wells. The purpose of the mass denials was to reduce the volume of pending modification requests as quickly as possible while extending as few permanent modifications as possible.

- 21 -

### 3.     BOA assigned key HAMP functions to third parties such as Urban.

56.     In order to appear to be compliant with HAMP, BOA contracted with third parties to provide HAMP-related services.  BOA controlled and closely supervised these third parties, one of which was Defendant Urban Settlement Services (aka Urban Lending Solutions, hereinafter "Urban").

57.     BOA identified Urban as a participant and member of an enterprise whose purpose was to create a phony front whereby BOA would offer borrowers the opportunity to receive a HAMP modification and thereby induce their response, but then reject a HAMP modification based on fraudulent pretenses of a homeowner's non-compliance.

58.     Thus, within weeks of committing to modify mortgages under HAMP by entering into an agreement with the Treasury Department, BOA contracted with Urban whereby BOA assigned to Urban key functions required to modify mortgage loans under the HAMP process.

59.     BOA assigned Urban specific tasks, and structured the arrangement so that BOA received daily, or even hourly, updates on everything Urban was doing with regard to HAMP. Urban and BOA interacted in a close relationship over which BOA maintained strict and meticulous control.  BOA created this close contractual relationship in order to ensure that Urban would participate in the loan-modification scheme and work with BOA in an enterprise that has a common goal of reducing the number of HAMP modifications issued to borrowers.

60.     Among other things, BOA assigned Urban to analyze the data in a "pool" of loans to determine the preferred modification program based on BOA criteria and perform quality control on the data.  Using BOA's criteria, Urban was to decide which modification program was

- 22 -

"appropriate."  Often, this involved shifting a borrower who applied for a HAMP modification into a less advantageous, internal, BOA modification that would be more profitable for BOA.

61.     Urban was to receive, track, and perform quality control on financial documents sent by customers.  It was to upload the documents to a web-based share-point site where it could be viewed by BOA.

62.     Urban was to field telephonic inquiries from BOA customers regarding the status of their loan modifications and strive to answer the customers' questions.  BOA also assigned Urban the task of proactively notifying homeowners when required documents were missing.  To carry out the goal of the enterprise, BOA created scripts that Urban was to use for the calls.

63.     Former Urban employees and a former BOA executive have confirmed that BOA demanded, and Urban provided, constant updates on virtually all aspects of work Urban performed.

64.     Urban was paid based on the volume of loan files it processed.  It was irrelevant to Urban's compensation whether it performed quality services to BOA borrowers, or actually succeeded in permanently modifying borrowers' mortgages.

65.     With each loan modification package that contained a Trial Period Plan, BOA directed borrowers to return signed Trial Period Plans and to send financial documents back to BOA.  The address to which borrowers were directed to send documents, however, was Urban's facility.  Similarly, borrowers were directed to send documents by fax and were given Urban's fax number.  Borrowers were falsely led to believe they were communicating with BOA.

66.     However, BOA and Urban actively concealed the nature of their relationship.  When answering calls from customers, Urban employees identified themselves as being from

- 23 -

BOA – typically from the "Office of the President." Urban employees were given titles and email addresses suggesting that they were employed by Bank of America. To the outside world of homeowners and regulators, Urban's workforce appeared to be employees and executives of Bank of America. Borrowers were under the false impression that they were speaking to and corresponding with BOA when, in fact, they were interacting with Urban employees.

67.     Urban only entered the documents months after they had been sent, only scanned in partial documents and, in many cases, did not post the documents at all.

68.     Urban scanned and entered documents into multiple computer systems and scattered over various links in the systems such that a particular homeowner's application packet would appear incomplete to a regulator or auditor reviewing the file.

69.     Both BOA and Urban employees reported the problems in the HAMP modification process on multiple occasions to BOA and Urban executives including Tyrone Wells, Troy Novotny, Kenneth Scheller, Robert Nicholson, Rebecca Mairone, David Swain, Patricia Feltch, Jinja Martin, and John Beranich. These were the executives and employees designated by BOA and Urban to oversee BOA and Urban's HAMP loan-modification efforts. Urban's performance did not improve and there were no efforts by BOA to change Urban's conduct or performance. Similarly, there were no substantial efforts by BOA to bring its own performance into compliance with reasonable business practices or to remediate the harm its failings caused hundreds of thousands of its customers. Both BOA and Urban continued on the same path, despite having full knowledge that it meant borrowers would be wrongfully denied, or delayed in getting, permanent modifications.

- 24 -

### 4.   BOA directed and encouraged Urban to fraudulently deny loan modifications.

70.     By secretly directing borrowers to return documents to Urban's locations, BOA used Urban as a repository for borrower documents.  In actual practice, and according to former Urban employees including Gregory Mackler and Bert Sheeks, along with former BOA supervisors Steven Cupples and William Wilson, BOA designed Urban to serve as a "black-hole" for the documents borrowers sent in the course of trying to obtain permanent loan modifications.  The manner in which BOA set up and directed Urban's processes guaranteed that the vast majority of Trial Period Plan Agreements would not be converted to permanent modifications in the time contemplated by the Trial Period Plan Agreements and by HAMP.

71.     Under BOA's scheme, loan modification packages were not forwarded to its underwriters until the borrower had submitted all required documents and the modification package was deemed "complete."

72.     At BOA's direction, Urban delayed forwarding modification packages to underwriting for months and instead noted on the computer system that documents were incomplete despite the fact that borrowers had provided all required documents.  Customers regularly heard nothing from BOA for months after sending in their documents and making their required trial payments.  When borrowers finally called to inquire as to the status of their modification, they were falsely strung along and told their loan was in process.  Eventually most borrowers were falsely told that their file remained incomplete and that they were required to send in additional documents.  Typically communications were over the phone, and were knowingly and intentionally deceptive in light of BOA and Urban's overall loan-modification scheme.

73.     Among the documents borrowers sent Urban, thinking that these were being sent to BOA, were bank statements, income statements, and W-2 forms that were provided to verify income.  BOA required that such documents were less than 90 (and sometimes 60) days old in order to support a permanent modification.  If a document such as a bank statement was dated more than 90 days previous, BOA would not accept the document for purposes of underwriting the modification and the loan file would be deemed "incomplete."  As part of the scheme, Urban customarily allowed the documents to "age" – meaning that it would not properly upload the documents until after the period by which they could be used for underwriting purposes.  BOA consequently deemed the documents to be unacceptable and deemed the file to be incomplete, and refused to provide a permanent modification to the borrower.  Again, as part of the scheme, this decision was not announced to the borrower for months – often more than a year after the borrower received their Trial Period Plan.

74.     The delay built into this system additionally allowed BOA and Urban to provide another basis for denial:  "excessive forbearance."  Pursuant to Trial Period Plans, borrowers were instructed to make "temporary" payments pending a permanent modification.  These amounts were by definition lower than the payments due under their un-modified mortgages.  However, during these "temporary" periods, and while pursuing its "black hole" delay strategy, BOA continued to consider the full, unmodified loan payments to be due from each borrower.  Borrowers who were paying the modified amount stated in their Trial Period Plan agreements for months were being charged the unmodified monthly amounts due.  BOA would increase the borrower's indebtedness by the difference each month.  Eventually, the borrower's level of

outstanding debt would rise to a point that crossed a threshold and BOA would decline the loan modification due to "excessive forbearance."

75.     Thus, the overwhelming majority of homeowners who sought permanent modifications from BOA pursuant to HAMP were placed into a delay loop where they were falsely told via the wire or mail that their documents had not been received even if they had been and, if their documents were acknowledged, they were told they were too old and thus had to be resubmitted.

76.     This scheme was successful.  BOA and Urban fraudulently denied permanent modifications to tens of thousands of borrowers who had fulfilled the requirements of their Trial Period Plans.

77.     The breadth and depth of this scheme is further illustrated by how BOA and Urban addressed complaints of homeowners and, in particular, homeowners who had pursued their complaints to the highest levels.

78.     Inquiries and complaints from borrowers that were escalated to within two levels of the CEO were recorded as "service requests."  By the third quarter of 2010, BOA had between 20,000 and 25,000 service requests from borrowers that had not yet been resolved, and the number was constantly growing.

79.     In approximately August 2010, BOA instituted a program it called the "drive for five."  The purpose of this program was to reduce the number of outstanding service requests to less than five thousand over a period of three months.

80.     Pursuant to their scheme and common plan BOA provided Urban with lists of service requests that needed to be closed on a daily basis.  These lists consisted of hundreds or

thousands of inquiries from homeowners regarding their home mortgages, including inquiries as to why they had not yet received a permanent modification despite complying with the terms of the Trial Period Plan.  Urban employees were required, at least in theory, to investigate the inquiry, investigate the underlying mortgage, and provide a recommendation as to the course of action.  If follow-up work needed to be done with the homeowner, the service request was still considered to be outstanding.  Alternatively, if the borrower could be determined to have failed the modification process, the service request could be deemed closed and the number of outstanding service requests would have been reduced.

81.     Urban employees were instructed, at BOA's direction and with BOA's full knowledge, to close service requests in a manner that would reduce the number of outstanding requests as quickly as possible.  Individual Urban employees were expected to close dozens of files per day.  Both BOA and Urban knew, and intended, that this would result in the false and deceptive denial of HAMP loan modifications to borrowers who were eligible to receive them.

82.     It was not feasible to reduce the service requests at the pace BOA demanded while thoroughly researching the borrower's file to confirm that documents had been sent or that the customer was indeed entitled to a permanent modification.  Urban employees could, however, reduce service requests at the pace BOA demanded by closing files and thereby deeming borrowers to have failed the HAMP modification process.

83.     According to former Urban employees including Gregory Mackler, Urban hired hundreds of new employees – many with no qualifications and little training, in an effort to reduce the number of outstanding service requests.  Urban employees were shown formulaic methods by which to close service requests.  These methods included closing a service request

(and therefore ending the HAMP process for the borrower) based on a "Missing Information Letter" or "Incomplete Information Notice" directed to the borrower in the electronic file.  Bert Sheeks has testified that Urban employees were encouraged to close files simply by seeing such a notice in the electronic system without researching whether the notice was accurate or whether the borrower responded to the notice.  Urban employees have confirmed that files were routinely closed on a fraudulent basis when it was apparent from the electronic records that the borrower had provided all required information and documents.

5.    **Urban and BOA executives knew loan modifications were being fraudulently denied and encouraged the fraud to continue.**

84.    Executives at both Urban and BOA were fully aware that thousands of borrowers were being wrongfully denied HAMP modifications pursuant to the loan-modification scheme, yet they allowed, encouraged, and directed that the loan-modification scheme should continue unabated.

85.    John Beranich was an Urban vice president who oversaw efforts to comply with BOA's demand to reduce the number of service requests.  Several former Urban employees including Gregory Mackler, Elizabeth Farmer, Shane Stahl, and Wesley White informed Beranich that Urban was regularly closing borrower files wrongfully and detailed the ways in which files were being wrongfully closed.  Beranich responded by reminding employees who complained that their job was to reduce the number of service requests and that failure to do so could lead to them losing their jobs.  On multiple occasions, employees who raised these types of concerns to Beranich were either fired or demoted.

86.     Urban employees who raised concerns to Beranich regarding the propriety of the manner in which service requests were closed were subject to discipline that included demotion or even termination.

87.     Robert ("Robbie") Nicholson is a BOA executive who oversaw Urban's efforts to reduce service requests.  According to former Urban employee Bert Sheeks, Nicholson was aware of the details of the manner in which Urban improperly closed service requests and that homeowners were being denied modifications and even losing their homes as a result. Nicholson did nothing to remedy these concerns.  Instead, Nicholson personally confronted Urban employees who raised concerns and put pressure on the supervisors of those employees to bring them "in line."

88.     Ken Scheller is a BOA Vice President and former executive of Countrywide. Scheller was instrumental in creating and implementing BOA's policies and procedures to process HAMP applications.  On multiple occasions, BOA and Urban employees directly informed Scheller that the processes were being administered in a manner that made it impossible for the vast majority of BOA customers to obtain permanent HAMP modifications. Scheller responded by telling at least one Urban employee who was raising concerns that BOA was "not of course interested" in faithfully reviewing modification requests.  Scheller directed the employee to "back off" the issue, since raising concerns of this kind was inconsistent with BOA's and therefore Urban's core efforts to *decrease* HAMP participation.

89.     Rebecca Mairone was a BOA Vice President and a former COO of Countrywide's Full Spectrum Lending division.  Mairone was instrumental in creating and implementing BOA's policies and procedures to process HAMP applications, including the extent to which

- 30 -

BOA used Urban to implement its HAMP scheme.  On multiple occasions, BOA employees and other executives directly informed Mairone that processes and training were inadequate, that error rates were unacceptable, and that, as a result, BOA customers who should have received HAMP modifications were being wrongfully declined and were instead losing their homes.  Despite repeated reports, Mairone did not implement remedial measures that could reasonably be expected to be effective, thereby allowing the loan-modification scheme to continue unabated.

90.     David Swain is a BOA Vice President who oversaw BOA's efforts to reduce its backlog of HAMP applications and outstanding trial plans.  Swain instituted high pressure initiatives to reduce backlog by declining HAMP applications and trial plans en masse.  According to a former high-level BOA executive, Swain was repeatedly informed from various sources – both verbally and in writing, that reviews and audits showed that BOA's "blitzes" and other mass declination programs were resulting in thousands of homeowners being wrongfully denied HAMP modifications.  Swain nevertheless continued with the same projects.

91.     Patricia Feltch is a BOA Vice President and former Countrywide executive.  Feltch was instrumental in implementing BOA's policies and procedures to process HAMP applications.  On multiple occasions, BOA employees and other executives directly informed Feltch that processes and training were inadequate, that error rates were unacceptable, and that, BOA customers were being wrongfully denied the opportunity to modify their mortgage loans and were instead losing their homes.  Feltch was also instrumental in imposing Blitzes and other mass decline efforts.  She continued to impose and implement efforts geared to mass declinations despite being specifically informed that thousands of homeowners were being wrongfully denied HAMP modifications as a result.

- 31 -

92.     BOA executives Rebecca Mairone, Ken Scheller, David Swain, Patricia Feltch, and Robbie Nicholson, along with their immediate superiors Tony Meola and John Berens, constituted a control group who designed and implemented BOA's HAMP policies and procedures in a way that deliberately worked to defraud homeowners and to extend as few HAMP modifications as possible while still giving the appearance that BOA was making efforts to comply with HAMP.

**6.     Notices provided by BOA and Urban were fraudulent.**

93.     Defendants knew and intended that they had created a "black hole" for homeowners seeking HAMP modifications, and that the overwhelming majority of applicants would never receive permanent HAMP modifications.

94.     Defendants knew and intended that, as a result of their scheme to delay and wrongfully deny modifications, BOA would not provide permanent modifications under the terms of these contracts to all borrowers who satisfied their obligations.  Defendants also knew and intended that the vast majority of borrowers who sought HAMP modifications, including those who received trial-payment agreements and satisfied their obligations, would instead be fraudulently denied a permanent modification on a falsified basis, or offered a permanent modification that did not comply with the terms of the contract.

95.     BOA and Urban knew and intended that Plaintiffs and other borrowers would rely on BOA's representations that BOA would provide a permanent modification on the terms offered, and Plaintiffs and other borrowers did in fact rely on the fact that BOA had promised them permanent modifications upon fulfillment of the Trial Period Plan Agreement.  Plaintiffs and other borrowers paid reduced payments, provided documents and incurred the costs of

providing those documents, and forewent other means of addressing their difficulties in paying their mortgages.

96.     BOA and Urban sent documents to, and made false statements to, homeowners by means of interstate commerce, including but not limited the mails, telephone lines, email, and the internet.  Such communications included letters instructing homeowners as to how to apply for HAMP modification; phone calls in which BOA and Urban employees knowingly misrepresented both the nature of the HAMP modification process and the status of borrowers' loan-modification applications; notices claiming that information or documents were missing; trial-payment; agreements; and notices of denial.  Each of these documents were either fraudulent in themselves or sent with an intent to further the enterprise's loan-modification scheme.  In the aggregate, Defendants used interstate mail and wire hundreds of thousands (and possibly millions) of times in their loan-modification scheme to make representations that they knew, or would have known but for their recklessness, were deceptive, false, and fraudulent.

97.     BOA contracted with other contractors to further its loan modification scheme. These contractors include Sykes Enterprises, Inc. ("Sykes"), who BOA retained to field telephone calls from customers attempting to secure HAMP modifications.  The contractors also included Stewart Settlement Services ("Stewart") who BOA retained to mail documents to homeowners seeking HAMP modifications and to receive, compile, and upload documents from homeowners.  As with Urban, BOA has closely controlled Sykes' and Stewart's work and performance.

- 33 -

### E.     BOA's Actions Caused Injury to Plaintiffs

98.     Plaintiffs have suffered injury caused by the scheme, including but not limited to longer loan payoff times, improper negative reporting to credit bureaus resulting in monetary harm due to damaged credit, monetary damages from higher principal balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, and wrongful foreclosure.  Further, in many instances, BOA actually encouraged or instructed borrowers to default on their loans in order to "qualify" for assistance, when in fact HAMP requires only that an "imminent risk of default" be attested to.  In addition, by complying with the terms of their Trial Period Plans and making lower payments, borrowers have placed themselves at risk of being considered in default, and losing their homes in foreclosure, because they have not made their full mortgage payments.

99.     Moreover, whenever BOA delays the tender of a Trial Period Plan or a permanent HAMP modification, the terms of such a modification are less beneficial to the homeowner than they otherwise would be had BOA properly performed.  If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to.  If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.

100.     Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, a former employee reports that BOA's practice is to report homeowners to credit reporting agencies as being delinquent without any further explanation thereby further damaging the homeowners' credit and therefore making alternative options to resolve delinquencies, such as refinancing, difficult or impossible.  Similarly, other forms of credit can and do become more expensive.

**F.     BOA Has Been Recognized as the Single Worst Performing Servicer under HAMP**

101.     Treasury publishes monthly and quarterly reports evaluating the performance of the MHA programs, including HAMP, and the performance of the servicers participating in those programs.[30]  These performance reports have shown that BOA routinely failed to modify the loans of struggling homeowners in a timely manner.  For example, Treasury withheld BOA's incentive payments related to decision-making timeliness based on its failure to comply with HAMP benchmarks through September 2011.[31]  Treasury's quarterly servicer reporting shows that between 22 percent and 67 percent of BOA's active Trial Period Plans remained unresolved for six months or longer as of each end-of-quarter date from December 2010 to December

---

[30] Treasury's "Making Home Affordable Program Performance Reports" are available at http://www.treasury.gov/initiatives/financial-stability/reports/Pages/Making-Home-Affordable-Program-Performance-Report.aspx.

[31] U.S. Department of Treasury, *Making Home Affordable Program Performance Report through April 2011* (June 9, 2011), at 19; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through July 2011* (Sept. 1, 2011), at 21; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through October 2011* (Dec. 7, 2011), at 21.

2012.[32]  BOA's performance in this measure among the ten largest servicers was the fourth-worst as of December 2010, third-worst as of March 2011, and second-worst as of June 2011.[33]

102.    BOA's relative performance did not improve; it was rated the worst among the large service providers in each quarter from September 2011 to December 2012.[34]  Treasury also evaluates each servicer's performance in internal controls and in identifying and contacting homeowners.  Each servicer receives one of three ratings for each performance metric:  (1) "did not meet benchmark; substantial improvement needed," (2) "did not meet benchmark; moderate improvement needed," and (3) "met benchmark; minor improvement may be indicated."[35]  Treasury concluded that BOA did not meet benchmarks and required "substantial" improvement in HAMP compliance and program results in the quarters ending March 2011 and June 2011, and "moderate" improvement in each quarter from September 2011 to December 2012.[36]  BOA's

---

[32] U.S. Department of Treasury, *Making Home Affordable Program Performance Report through April 2011* (June 9, 2011), at 20, 37; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2012* (Mar. 2, 2012), at 24, 39; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through October 2012* (Dec. 7, 2012), at 26, 43; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2013* (Mar. 8, 2013), at 26, 43.

[33] U.S. Department of Treasury, *Making Home Affordable Program Performance Report through April 2011* (June 9, 2011), at 18-36; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2012* (Mar. 2, 2012), at 22-38.

[34] U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2012* (Mar. 2, 2012), at 22-38; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through October 2012* (Dec. 7, 2012), at 26-42; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2013* (Mar. 8, 2013), at 25-42.

[35] *See, e.g.*, U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2013* (Mar. 8, 2013), at 19.

[36] U.S. Department of Treasury, *Making Home Affordable Program Performance Report through April 2011* (June 9, 2011), at 19; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through July 2011* (Sept. 1, 2011), at 21; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through October 2011* (Dec. 7, 2011), at 21; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2012* (Mar. 2, 2012), at 23; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through April 2012* (Apr. 19, 2012), at 26; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through July 2012* (Sept. 13, 2012), at 26; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through October 2012* (Dec. 7,

performance has thus been found to require improvement in HAMP compliance and program results in every quarter from March 2011 (when Treasury began reporting its assessment of servicer compliance) to December 2012.

103.    BOA executives internally recognized that its performance was grossly below the benchmarks Treasury expected and below the performance that would be expected in normal business practice.  For example, Treasury expected servicers to reach a decision as to whether to extend a Trial Period Plan within 30 days of receiving financial documents from the applicant at a rate of 95% of all applications.  BOA executives including Rebecca Mairone, Patricia Feltch, Ken Scheller, and David Swain internally recognized that its rate was approximately 60%, but did little or nothing to correct this shortcoming.

104.    BOA executives recognized that the errors it made in deciding to decline applications for loan modifications were at rates that it would have considered unacceptable in any of its regular lines of business.  BOA normally considers error rates above 2% to be unacceptable in its regular business practices.  BOA's internal audits showed that it erroneously declined applications for HAMP modifications at rates that exceeded 25%.  The negative ratings BOA received from Treasury were deserved and were likely understated.

## V.    CLAIMS OF NAMED PLAINTIFFS

### A.    Steven and Sandra Leavitt

105.    Plaintiffs Steven and Sandra Leavitt purchased their home in Newton, New Hampshire in July of 2008.  They financed the purchase with a 30-year fixed mortgage from TD Bank.  Their mortgage was transferred to Countrywide almost immediately and was conveyed to

---

2012), at 25; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2013* (Mar. 8, 2013), at 25.

Bank of America as part of its purchase of Countrywide. The loan had a fixed rate of 6.125% and called for monthly payments of $2,009.42. Mr. and Mrs. Leavitt lived in the home that secured their mortgage as their primary residence. They made all of their mortgage payments in full and on time.

106.     In January 2009, Mr. Leavitt's employer went out of business and he lost his job. At about the same time, Mrs. Leavitt was laid off when her employer downsized. Though they both ultimately found other jobs, the Leavitt's household income was reduced by more than 35% – from approximately $80,000 to approximately $50,000 per year.

107.     In July 2011, Mr. Leavitt heard about the MHA and HAMP programs on the news. He gathered information about the program, about HAMP requirements, and about the process of applying for a loan modification under HAMP through the Bank of America website. BOA's website was misleading and deceptive, and gave Mr. Leavitt the impression that if he met the requirements for HAMP, and made the required trial payments, BOA would act in good faith and provide the Leavitts with a permanent HAMP modification. These statements by BOA were intentionally false and misleading at the time.

108.     On July 21, 2011, the Leavitts contacted Bank of America in an effort to request that they be considered for a loan modification under HAMP and were told HAMP application paperwork would be sent. From August through the end of October 2011, the Leavitts contacted BOA several times a week to check on the status of the requested HAMP loan modification application paperwork. They were repeatedly transferred to various extensions that ended by being cut off. They were directed to call particular people and were given phone numbers that were not answered when called. They were repeatedly told that the person they were told to call

was "out sick," "on vacation," "no longer employed," or otherwise "unavailable." They left

dozens of messages that were not returned. These misleading and deceptive phone conversations

were part of Defendants' overall loan-modification scheme, and are typical of what thousands of

other borrowers also experienced.

109.     On October 21, 2011, the Leavitts spoke with Joseph Delgadillo, their first BOA

assigned customer relationship manager ("CRM"), who promised the documents would be sent

to them within 20 days and, on November 3, 2011, after more than three months of requesting to

be considered for HAMP, the Leavitts received an application by mail.  On November 11, the

Leavitts returned the completed application along with all the documents requested including a

completed and signed Hardship Affidavit, bank statements, pay stubs, their most recent tax

return, utility bills, and a completed IRS Form 4506T.  As directed, the Leavitts sent these

documents to "Bank of America" at an address in Broomfield, Colorado.  Unbeknownst to the

Leavitts, the address to which they sent documents actually belonged to Urban, not to BOA.

110.     Over the next several months, the Leavitts called Mr. Delgadillo at least 1-2 times

each week to inquire as to the status of their application.  They were repeatedly told, in telephone

communications, that their application was "under review" and that they could expect to hear

back from BOA any day.  These communications were knowingly and intentionally false, and

were part and parcel of Defendants' use of the wires to perpetuate a scheme of deception and

fraud involving thousands of borrowers like the Leavitts.

111.     The Leavitts were told on at least one occasion that all their documents had been

lost and that they would need to re-send them immediately.  They were also instructed to re-send

particular documents they had previously sent.  This false and knowing misrepresentation that

Defendants had not received, or had "lost," the Leavitts' documents was precisely the sort of misrepresentation Defendants intended to be issued to thousands of borrowers like the Leavitts, by use of the mails and wires.

112.    On February 25, 2012, the Leavitts received a letter stating they were not eligible for a HAMP modification because a "more appropriate alternative" existed.  The letter did not identify the alternative that was supposed to have been more appropriate.  The Leavitts were instructed to re-submit all documents yet again.  This knowing, intentional, and deceptive attempt to push the Leavitts out of a HAMP modification, and to require the Leavitts to once again send in documents they had previously sent on multiple occasions, was made pursuant to Defendants' loan-modification scheme and enterprise and was typical of communications made to thousands of other borrowers.

113.    The Leavitts fully complied with each demand that they send in documents and promptly sent the documents BOA requested – even when they had already sent the same documents multiple times.  Each request for additional documents instructed the Leavitts to send documents to BOA in Colorado.  Unbeknownst to the Leavitts, they were sending documents to Urban rather than to BOA.

114.    On March 30, 2012, the Leavitts finally received a Trial Period Plan.  The Trial Period Plan called for payments of $1,661.96 to be paid on May 1, June 1, July 1, and August 1, 2012.  The amount called for was not properly calculated in a manner consistent with HAMP's waterfall method.  The Trial Period Plan misleadingly, deceptively, and intentionally led the Leavitts to believe that if they made their trial payments on time, they would receive a permanent modification at the end of the trial plan, when in fact Defendants' loan-modification scheme and

enterprise was designed to prevent such modifications from occurring.  This written, deceptive communication through the mails was identical, or extremely similar, to communications sent to thousands of other borrowers in situations similar to those of the Leavitts.

115.    The letter accompanying the Trial Period Plan directed the Leavitts to again send financial documents to "Bank of America" at an address that actually belonged to Urban.  The Leavitts sent all requested documents to the specified address via Federal Express.  The Leavitts confirmed that the package reached its destination on April 9, 2012.

116.    The Leavitts made each of the trial payments in full and on time.  Though the Trial Period Plan itself, BOA's website, HAMP directives, and information on Treasury's MHA website all indicated that the Leavitts could expect a permanent modification within a month of the end of the trial period, the Leavitts did not receive a permanent loan modification at the close of the trial period.  At the end of the Trial Period Plan, the Leavitts were told by CRM Delgadillo that there was a large backlog of modifications and were instructed to continue making the same reduced mortgage payments of $1,661.96 until the permanent modification was completed and that these payments would reflect on-time mortgage payments made against the correct start date of the modification paperwork.  The Leavitts were told normal monthly statements would still automatically be sent out for the original mortgage payment amount but to ignore them and continue making these extended Trial Period Plan reduced payments.  Each of these additional payments were made in full and on time.

117.    From April to December, 2012, BOA assigned no fewer than 4 CRMs to the Leavitts' modification.  The vast majority of the Leavitts' attempts to obtain information regarding the status of their modification went unanswered.

118.     In November 2012, the Leavitts finally received a permanent modification offer by mail.  The accompanying letter stated that the documents needed to be signed and notarized by November 18, 2012 and advised them to expect a call to set up an appointment at a Bank of America branch to have the documents signed and notarized at no cost to them.  Included with the modification documents was a "secondary note" in an amount of more than $12,000 that would be due as a balloon payment at the end of the mortgage term.  This amount included additional interest, costs and fees that Bank of America added to the loan principal.  The modification documents were sent in BOA's name from Urban's address in Broomfield, Colorado.

119.     After multiple unreturned calls to Bank of America and with the deadline drawing near, the Leavitts independently sought out a Bank of America manager at a local branch regarding BOA documents that needed to be signed and notarized.  BOA Banking Center Manager (Plaistow NH branch) Valbona Mino reviewed the documents with the Leavitts, who then signed them in front of Mino on November 15, 2012, with Mino signing as notary public where required.  They returned the documents by mail the same day and confirmed that they were received the following day.

120.     On Monday, November 19, 2012 – one day after the deadline Bank of America had set for the Leavitts to return their modification documents – the Leavitts received a letter informing them that their mortgage had been sold to Nationstar Mortgage and that it would no longer be serviced by Bank of America.

121.     The Leavitts learned that Bank of America had transferred their loan without reflecting any modification.  All reduced mortgage payments made under the Trial Period Plan,

- 42 -

as well as the additional reduced payments made under direction of their Bank of America CRM, had been recorded as underpayments and showed the Leavitts had defaulted during the Trial Period Plan.  According to Nationstar, the loan was now over $6,089 in arrears due to yet more interest, fees and costs that Bank of America added to the loan principal.  The Leavitts were at risk of foreclosure despite never having missed a payment on their mortgage.

122.    Nationstar had the Leavitts re-apply for a HAMP modification.  The process was finished in approximately four months.  The Leavitts obtained a modified loan, but were required to take on a secondary mortgage with a balloon payment of over $19,000 due at the maturity of the loan.

123.    As a result of the enterprise that Defendants created, it took the Leavitts over two years to complete a process that should have taken four months, and they now owe thousands of dollars more on their mortgage.

124.    Defendants repeatedly used mail and wire to issue knowingly false communications to the Leavitts regarding their loan modification and the status of the loan modification, just as Defendants did with thousands of other borrowers pursuant to their loan-modification scheme.

**B.     Richard George**

125.    Plaintiff Richard George purchased his home in Puyallup, Washington in April 2006.  He financed the mortgage with a mortgage loan that was quickly transferred to Countrywide Mortgage.  Mr. George lived with his wife and two children in the home that secured their mortgage as their primary residence.

- 43 -

126.    In June 2007, Countrywide aggressively marketed a refinance to Mr. George

claiming he could save money and financially benefit by refinancing.  The loan representative

employed a bait and switch tactic in that the final mortgage carried a higher interest rate than was

represented.  The mortgage ultimately raised the amount of his outstanding principal.  The loan

carried an interest rate of 6.375% and called for monthly payments of $2,684.

127.    Mr. George works as a longshoreman.  In late 2008, his household's income

dropped from approximately $10,000 to $5,000 per month when Mr. George's hours were cut as

a result of the economic downturn.

128.    In July 2009, Mr. George heard about the MHA and the HAMP program.  He

called BOA, and asked to be considered for a loan modification under HAMP.  On July 3, 2009,

he was told over the telephone by a BOA representative to pay a modified amount of $1,200 and

that the necessary documents would follow by mail.  Mr. George made the payment as directed.

129.    Instead of documents regarding a modification, Mr. George received a Notice of

Intent to Accelerate on August 6, 2009.  When he called on the same day to make the modified

payment, he was told by the representative that he spoke to that he was not eligible for a

modification and that he needed to pay all past due amounts immediately to avoid foreclosure.

Mr. George paid over $8,000 on September 24, 2009, that BOA demanded in order to avoid

foreclosure.

130.    For the next several months, Mr. and Mrs. George exhausted their savings to

continue to pay their full mortgage payment.  They called BOA several times to request a HAMP

modification.  Their calls were repeatedly transferred and then dropped, they were given phone

numbers to call that ultimately had no answer, and left repeated messages that were not returned.

131.    On May 10, 2010, Mr. George received a letter in the mail acknowledging his requests for a HAMP modification and instructing him to send in financial documents so that BOA could determine his eligibility.  On May 18, 2010, Mr. George returned all the documents requested including a completed and signed Hardship Affidavit, bank statements, pay stubs, most recent tax return, and recent utility bills.  As directed, Mr. George sent these documents to "Bank of America" at an address in Pittsburgh, Pennsylvania.  Mr. George confirmed the receipt of the documents with a Federal Express tracking number.  Unbeknownst to Mr. George, the address to which he sent documents actually belonged to Urban, not to Bank of America.

132.    Defendants sent these instructions to Mr. George, and similar instructions to thousands of other homeowners, knowing and intending that the instructions would induce Mr. George and other homeowners to act.  At the time these instructions and other documents regarding HAMP modifications were sent to Mr. George and thousands of other homeowners, Defendants also knew and intended that pursuant to their loan-modification scheme, Defendants were actively denying HAMP modifications *en masse* and for false reasons.  Thus, these instructions were misleading and deceptive when they were given.

133.    On June 24, 2010, Mr. George received a document entitled "FHA Home Affordable Modification Trial Period Plan."  Under the terms of this FHA Trial Period Plan, Mr. George was required to make three payments of $2,182.40 on or before August 1, September 1, and October 1, 2010, respectively.  According to the terms of the agreement, if Mr. George timely made those payments and a series of representations in the agreement continued to be true, BOA represented that his loan would be permanently modified.

- 45 -

134.     This Trial Period Plan sent to Mr. George, and similar agreements sent to thousands of other homeowners, were knowingly deceptive and misleading, and were intended to induce Mr. George and other homeowners to act.  At the time these agreements and plans were sent to Mr. George and thousands of other homeowners, Defendants knew and intended that pursuant to their loan-modification scheme and enterprise, Defendants were actively denying HAMP modifications *en masse* and for false reasons.  Thus, these agreements and plans were misleading and deceptive when they were given.

135.     As instructed, Mr. George returned the signed and notarized FHA Trial Period Plan Agreement to BAC Home Loans Servicing at an address in Broomfield, Colorado.  He confirmed the receipt with a Federal Express tracking number.  Unbeknownst to Mr. George, the address provided belonged to Urban and not to Bank of America.

136.     Mr. George made all trial payments on time and fulfilled all requirements of the FHA Trial Period Plan.  Though the Trial Period Plan itself, and BOA's website, indicated that Mr. George could expect a permanent modification within a month of the end of the trial period, Mr. George did not receive a permanent loan modification at the close of the trial period.

137.     On October 1, 2010, Mr. George called to inquire about the status of the modification he was led to expect.  He was told by the representative he spoke to on the telephone that his file was "under review" but that he should continue making payments in the amount stated in the trial plan.  This statement, made over the wires, was knowingly and intentionally misleading and deceptive in light of Defendants' loan-modification scheme and enterprise designed to delay or deny HAMP modifications.

- 46 -

138.     Despite making all payments as instructed, BOA sent Mr. George a Notice of Intent to Accelerate his loan dated January 4, 2011.  On January 30, 2011, Mr. George spoke to a representative named Rosario, who stated their system did not show him to be in a modification, claimed that BOA never received a signed and notarized trial period plan, and claimed that the financial documents BOA requested had not been received.  These statements were knowingly and intentionally false, and made over interstate wires, just as thousands of other borrowers received similarly false wire and mail communications as part of Defendants' loan-modification scheme.

139.     Mr. George has continued to tender payment of $2,182.40 to BOA that BOA has accepted.

140.     Despite the fact that he made all payments as directed, BOA continued reporting Mr. George as being delinquent on his mortgage thereby significantly damaging his credit.

141.     As a result of the enterprise that Defendants created, Mr. George and his family are now living in limbo.  They have continued to receive false and often conflicting information from BOA regarding the status of their loan.  BOA claims additional amounts are owed on the loan and the George family is living at risk of foreclosure.

142.     Defendants repeatedly used mail and wire to issue knowingly and intentionally false communications to Mr. George regarding his loan modification and the status of the loan modification, just as Defendants did with thousands of other borrowers pursuant to their loan-modification scheme.

## VI.     CLASS ACTION ALLEGATIONS

143.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

144.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on their own behalf and on the behalf of all other members of the classes described below.

**A.    National RICO Class and State Classes**

145.    Plaintiffs seek certification of a national class consisting of all individuals whose home mortgage loans have been serviced by BOA and who, since April 13, 2009, (1) applied to BOA for a HAMP loan modification, (2) fulfilled an FHA Trial Period Plan Agreement or any other trial-payment agreement that was not issued pursuant to SD-09 (form 3156), (3) sent documents to, or received documents or other communications from, Urban employees in connection with their attempts to modify their home mortgage, and (4) did not receive, within 30 days after making all required trial payments, a permanent loan modification that complied with HAMP rules.

146.    Plaintiffs also seek certification of state classes for all borrowers in the states of Alabama, Arizona, Arkansas, Colorado, Idaho, Kansas, Kentucky, Louisiana, Maine, Nebraska, Nevada, New Hampshire, New Mexico, Oregon, Pennsylvania, South Dakota, Washington, and Wisconsin ("the State Classes") who:  (1) received a FHA Trial Period Plan Agreement, (2) timely made all trial payments under that agreement, and (3) did not receive, within 30 days after making all required trial payments, a permanent loan modification that complied with HAMP rules.

147.    Excluded from the National RICO Class and the state classes are individuals who are included in the class sought to be certified in the litigation styled as:  *In re Bank of America Home Affordable Modification Program Contract Litig.*, Case No. 1:10-md-02193-RWZ.  That

- 48 -

Class is limited to borrowers who fulfilled a Trial Period Plan Agreement that was provided pursuant to Treasury Directive SD-09 (form 3156).  Further excluded from the class are governmental entities, Defendants, their affiliates and subsidiaries, BOA's current employees and current or former officers or directors, the members of this Court and its staff.

148.    The Named Plaintiffs in the National RICO Class and the state classes sue on their own behalf and on behalf of classes of persons under Rules 23(b)(2) and 23(c)(4) of the Federal Rules of Civil Procedure.

149.    Plaintiffs do not know the exact size or identities of the National RICO Class or the state classes, since such information is in the exclusive control of Defendant.  Plaintiffs believe that the National RICO Class and each of the state classes encompass many thousands of individuals and whose identities can be readily ascertained from Defendants' books and records. Therefore, the National RICO Class and the state classes are so numerous that joinder of all members is impracticable.

150.    All members of the National RICO Class have been subject to and affected by the same conduct.  The claims are based on uniform loan modification processing requirements and evidence of a coordinated and concerted effort to frustrate and upend HAMP.  There are questions of law and fact that are common to the National RICO Class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

      a.    the existence of the enterprise designed to minimize the number of permanent modifications that BOA would extend to borrowers under HAMP;

      b.    the nature and scope of the enterprise;

c.      whether Defendants' issuance of HAMP solicitation letters and letters of instruction were fraudulent due to processes they put in place to guarantee that no more than a small minority of HAMP modifications would ever be fulfilled;

d.      whether Defendants' information and instructions that were publicly made available via the internet were fraudulent due to processes they put in place to guarantee that no more than a small minority of HAMP modifications would ever be fulfilled;

e.      whether Defendants' issuance of Trial Period Plan Agreements and other trial-payment agreements were fraudulent due to processes they put in place to guarantee that no more than a small minority of HAMP modifications would ever be fulfilled;

f.      whether Defendants' enterprise perpetrated a fraudulent scheme on homeowners applying for assistance promised under HAMP;

g.      whether Defendants' enterprise perpetrated fraud by deliberately delaying the process of underwriting applications for modifications from customers;

h.      whether information and notices issued to borrowers that fostered delay and claimed that documents were missing constituted fraud; and

i.      whether the Classes are entitled to damages.

151.    All members of the state classes have been subject to and affected by the same conduct.  The claims are based on similar or identical Trial Period Plans, and therefore there are questions of law and fact that are common to the state classes, which predominate over any questions affecting only individual members of the classes.

152.    The claims of the Plaintiffs are typical of the claims of the National RICO Class and the state classes and do not conflict with the interests of any other members of the classes.

153.     The other members of the classes were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

154.     The named Plaintiffs will fairly and adequately represent the interests of the National RICO Class and the state classes.  They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection and RICO actions.

155.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

156.     This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(3) for issues of liability.

## VII.   EQUITABLE TOLLING, DISCOVERY RULE RE: STATUTES OF LIMITATIONS

157.     Any applicable statutes of limitations have been tolled by Defendants' illegal, deceptive, and fraudulent practices.  Defendants have concealed from Plaintiffs and the Classes the truth about their illegal, deceptive, and fraudulent practices described herein, thereby tolling the running of any applicable statutes of limitations.

158.     Plaintiffs and the classes had no knowledge and could not have reasonably discovered Defendants' illegal, deceptive, and fraudulent practices as alleged herein until recently.

159.     Defendants are estopped from relying on any statute of limitations defense because of their illegal, deceptive, and fraudulent practices as alleged herein.

## VIII.   COUNTS

## COUNT I

## BY THE NATIONAL RICO CLASS

### Violation of Racketeer Influenced and Corrupt
### Organizations Act, 18 U.S.C. §1962(C)

160.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

161.     From at least May 6, 2009, to the present, the affiliation between BOA and Urban constituted an enterprise.  Defendants conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c).

162.     The RICO enterprise, which engaged in, and whose activities affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included Bank of America, N.A., and its subsidiary BAC Home Loans Servicing, LP, Urban Settlement Services, LLC, along with several of their respective employees and officers, including John Beranich, Robbie Nicholson, Ken Scheller, Patricia Feltch, Rebecca Mairone, David Swain, and Jinja Martin.

163.     The members of the RICO enterprise all had a common purpose:  to extend as few permanent HAMP modifications as possible while providing BOA a justification to claim that borrowers had not fulfilled their trial-payment agreements or were otherwise ineligible for HAMP modifications.  At BOA's direction and with BOA's full knowledge, Urban instructed its employees to close borrowers' claim modification files without an adequate investigation, thereby deeming the borrowers to have failed the HAMP modification process, even when it was

- 52 -

apparent from the electronic records that the borrower had provided all required information and documents.  BOA and Urban executives were not only informed that the files were closed without a sufficient investigation, but actively encouraged or cajoled Urban employees to do so.

164.    The enterprise was also forged by the relationships among those associated with it.  BOA contracted with Urban and assigned to it the key aspects of the process of administering trial plans and providing permanent modifications to borrows who fulfilled the terms of their trial plans.  Through their respective employees, BOA and Urban coordinated their activities to frustrate the HAMP process and limit the number of homeowners who obtained permanent loan modifications, while maintaining the appearance of compliance to regulators and the public.  For example, BOA directed that Urban employees identify themselves as being from Bank of America – typically from the "Office of the President."  Urban employees were given titles and email addresses suggesting that they were employed by Bank of America to create the false impression to borrowers that they were speaking to and corresponding with BOA when, in fact, they were interacting with Urban employees.  BOA set up and directed Urban's processes in a manner that guaranteed that the vast majority of HAMP applicants would not obtain permanent HAMP modifications.  As part of the scheme to defraud, Urban became a "black hole" for documents sent the homeowners by, for example, allowing the documents to "age" so that they would not support a permanent modification.  For its part, BOA would deny modifications, claiming that the information (which was residing with Urban) had not been received.

165.    This RICO enterprise has remained in existence for several years, enabling its members to pursue the enterprise's purpose.  BOA and Urban conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that began in 2009 and

- 53 -

continues through the present and has consisted of hundreds of thousands (or millions) of acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

166.    BOA and Urban engaged in a scheme or artifice to defraud borrowers by stalling and hindering the loan modification process and misleading the borrowers to prevent many of the homeowners who are eligible for permanent loan modifications and who have met the requirements for participation in HAMP from receiving the loan modifications to which they are entitled.

167.    BOA and Urban were aware of this scheme and actively participated in it by, for example, misrepresenting Urban employees as BOA employees and by establishing delaying tactics that would guarantee that as few borrowers as possible would receive their loan modifications.

168.    The U.S. mail or wire services, including internet, telephone and email were used in furtherance of the scheme.  Use of the mail or wire services were either known to BOA and Urban or it was reasonably foreseeable that they would be used for this purpose.

169.    Defendants' repeated violations of the federal mail and wire fraud statutes, which have all occurred in the last few years, include:

a.    Providing instructions over the internet as to the steps a homeowner would need to take to secure a permanent loan modification under HAMP with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to follow the steps stated on their website that would enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

- 54 -

b.      Sending instructions to Plaintiffs and other homeowners by mail, fax, email or internet directing them to provide documents and other information to be considered for a HAMP loan modification, with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

c.      Providing Trial Period Plans to Plaintiffs and other homeowners by mail, email or internet, which purported to offer permanent modifications in 4 months if certain terms were meant, with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to perform the contracts as promised, and that only a small percentage of homeowners would receive permanent modifications as represented in the Trial Period Plan Agreements.

d.      Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because they had not provided necessary financial documents, when in fact Defendants knew that the homeowners had provided the documents.

e.      Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because their financial information was not timely, even though Defendants knew that the documents were timely when the homeowners provided them.

f.      Intentionally providing thousands of homeowners who applied for HAMP loan modifications, and who were qualified to receive HAMP modifications, with in-house loan modifications that were less advantageous to homeowners but more profitable to BOA.

170.     The scheme to defraud that was perpetrated by BOA and Urban and their employees and which was at the center of the racketeering activity, involved issuing trial-payment agreements to thousands of eligible applicants, when BOA intended to deny the vast majority of those agreements on entirely false grounds.

171.     As part of and in furtherance of the scheme to defraud, Urban and BOA would receive documents and information by mail, fax, telephone and/or email from homeowners fulfilling their Trial Period Plan Agreements and intentionally delay acting on the documents for several months.

172.     As part of and in furtherance of the scheme to defraud, Urban and BOA would receive documents and information by mail, fax, telephone and/or email from homeowners and intentionally fail to record receipt of the documents on electronic systems or to convey the modification package to underwriting for months and often not until the documents had aged beyond the point that they could be used for underwriting.

173.     As part and in furtherance of the scheme to defraud, Urban and BOA intentionally manipulated and falsified data on customers' electronic files so that files could be closed and modification applications rejected.

174.     As part of and in furtherance of the scheme to defraud, Urban and BOA would send borrowers' notices by mail, fax, telephone and/or email that information or documentation was missing from the homeowners' modification files when Urban and BOA knew that the homeowners had provided the information.

175.     As part of and in furtherance of the scheme to defraud, Urban and BOA regularly sent customers notices of denial by mail, fax, telephone and/or email that Urban and BOA knew to be based on reasons that were untrue.

176.     As part of and in furtherance of the scheme to defraud, Urban employees falsely held themselves out to BOA customers and to the public by mail, fax, telephone and/or email as being employees and executives of BOA and gave homeowners the false impression that they were speaking to and corresponding with BOA executives from the "Office of the President."

177.     These thousands of violations constitute a pattern of racketeering.  They are related in that they share the same purpose of defrauding homeowners, involve the same participants, victims, and methods of commission.  And because defendants' large-scale criminal activities occurred over a period of several years and are continuing unabated, they amount to or pose a threat of continued criminal activity.

178.     Each of the defendants associated with the RICO enterprise knew of existence of the enterprise and its related activities.  BOA, through its designated officers and employees, devised the loan-modification scheme and coordinated with Urban to carry it out.  Individual defendants oversaw, directed, and managed various aspects of the scheme, including authorizing Urban employees to employ unscrupulous methods to reduce the number of borrowers who would be granted loan modifications and reprimanding those employees who objected.

179.     BOA and Urban and their employees conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity.  Each of the defendants participated in the enterprise's decision-making or were plainly integral to carrying out the scheme to defraud.  Specifically, BOA through its employees, including Scheller, Mairone,

Nicholson, Martin, Feltch, and Swain, set up the process for approving the loan modifications to ensure that the vast majority of applications would not result in permanent modifications in the time contemplated by HAMP.  BOA and its officers and employees, including Nicholson and Scheller, supervised Urban and coordinated with Urban and its officers and employees, including Beranich, to ensure that the processes were carried out according to plan.

180.    As part of their participation, Urban and BOA knowingly and intentionally sent, mailed, and transmitted or caused to be sent, mailed, or transmitted fraudulent solicitations, instructions, and Trial Period Plan Agreements in interstate or foreign commerce.  These fraudulent documents constituted numerous and repeated violations of the federal mail and wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 (1), 1962 (c).  Defendants knew, or at a minimum were reckless in not knowing, that the documents were misleading, deceptive, and/or false when sent, as a result of the actions of their officers and employees pursuant to the loan-modification scheme outlined in this Complaint.

181.    In addition, BOA and Urban sent, mailed and transmitted or caused to be sent mailed or transmitted, in interstate or foreign commerce, notices containing false and fraudulent information pertaining to the status of borrowers' efforts to obtain a permanent loan modification under HAMP to Plaintiffs and to thousands of members of the National RICO Class.  These fraudulent notices constituted numerous and repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(1), 1962 (c).

182.    By reason of their conduct and participation in the racketeering activity,

Defendants caused damages to Plaintiffs and to members of the National RICO Class.

## COUNT II

### AGAINST BOA DEFENDANTS ON BEHALF OF THE STATE CLASSES

### Breach of Contract based on Promissory Estoppel

183.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

184.    BOA, by way of its trial-payment agreements, made representations to Plaintiffs

that if they made their trial payments and otherwise qualified for HAMP modifications, they

would receive permanent HAMP modifications.

185.    BOA's trial-payment agreements and other representations to Plaintiffs were

intended to induce Plaintiffs to rely on them and make monthly trial payments.

186.    Plaintiffs did indeed rely on BOA's representation, by submitting trial payments

and otherwise following BOA's instructions for steps to follow in order to receive a permanent

modification.

187.    Given the nature of the promises and the language in the trial-payment

agreements, Plaintiffs' reliance was reasonable.

188.    Plaintiffs' reliance was to their detriment.  Such detriment includes longer loan

payoff times, higher principal balances, improper negative reporting to credit bureaus,

inappropriate fees and charges assessed to them, including broker price opinion fees, inspection

fees, attorney's fees, "process management" fees, late fees and other charges associated with

delinquency and default, and increased accrued interest.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.      Certify this case as a class action and appoint the named Plaintiffs to be class representatives for each class for which they are designated and their counsel to be class counsel;

B.      Enter a judgment declaring the acts and practices of BOA complained of herein to constitute fraud, together with an award of monetary damages and other available relief on those claims;

C.      Grant a permanent or final injunction enjoining BOA's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Classes;

D.      Order BOA to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

E.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

F.      Treble damages and the cost of the suit, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

G.      Grant Plaintiffs and the Classes such other and further relief as this Court finds necessary and proper.


Dated:  July 10, 2013

Respectfully Submitted,

Hagens Berman Sobol Shapiro LLP

By:      */s/Steve W. Berman*
         Steve W. Berman
Tyler Weaver
Ari Y. Brown
1918 8th Avenue, Suite 3300
Seattle, WA  98101
206.623.7292 (p)
206.623.0594 (f)
steve@hbsslaw.com
ari@hbsslaw.com

Craig R. Valentine
Hagens Berman Sobol Shapiro LLP
2301 E. Pikes Peak Avenue
Colorado Springs, CO 80909
719.635.0377 (p)
719.635.2920 (f)
craigv@hbsslaw.com