IN THE UNITED STATES COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 13-cv-1819-PAB-KLM

RICHARD GEORGE;
STEVEN LEAVITT;
SANDRA LEAVITT;
DARRELL DALTON; and
all others similarly situated,

    Plaintiffs,

    v.

URBAN SETTLEMENT SERVICES d/b/a URBAN LENDING SOLUTIONS; and
BANK OF AMERICA, N.A.,

    Defendants.

**PLAINTIFFS' OPPOSITION TO DEFENDANT BANK OF AMERICA N.A.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT (DKT NO. 14)**

## I. INTRODUCTION

The First Amended Complaint ("FAC") exposes in detail how Defendant Bank of America ("BOA") oversaw an association-in-fact enterprise with the common purpose of using the federal Home Affordable Modification Program ("HAMP") as an engine for profit above the bailout money to which the program was attached, rather than to help the homeowners the program was supposed to protect. Based on information from former employees and public records, the FAC explains how BOA and Defendant Urban Lending ("Urban") managed an enterprise aimed at denying mortgage modifications to struggling borrowers who had qualified for modifications under HAMP. That enterprise exploited the mails and wires in order to falsely represent to borrowers that if they complied with Defendants' instructions and demands, they would receive a modification of their mortgages. In reality, Defendants had secretly stacked the deck against borrowers with the intent of avoiding HAMP modifications, pushing homeowners further and further into default, and then profiting from the homeowners' predicament.

BOA, wanting out of this case before discovery, has barely squeezed into 15 pages a slew of baseless arguments about why the Court should dismiss the FAC. BOA's arguments about the distinctness of the enterprise ignore current law and the FAC's actual allegations. BOA's arguments about fraud and extortion fail to take into account the FAC's extensive detail. And BOA's promissory estoppel argument, at its core, is simply an argument that BOA should not be held to its unambiguous promises. The Court should deny the motion.

## II. STATEMENT OF FACTS AND STANDARD OF REVIEW

Plaintiffs refer the Court to the Opposition to Defendant Urban Lending's Motion to Dismiss First Amended Complaint (Dkt. No. 13), at pp. 2-5, for a discussion of the facts of this case, and the relevant standard of review for a motion to dismiss pursuant to Rule 12(b)(6).[1]

## III. ARGUMENT

### A. Plaintiffs Have Sufficiently Pled a RICO Enterprise. (Issue is DISPUTED)

Plaintiffs identify an association-in-fact enterprise consisting of BOA, its subsidiary BAC Home Loans, Urban, specified executives, Sykes Enterprises, Inc., Wingspan Portfolio Advisors, and two law firms. ¶ 248. BOA claims this cannot be a RICO enterprise because it consists solely of BOA, its employees, and entities BOA claims to be its agents. Mtn. at 3-4. Courts have rejected similar arguments for over a decade – particularly when the enterprise involves a corporation acting with its non-exclusive agents.

RICO makes it unlawful for "any person … associated with any enterprise … to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c). In what has come to be known as RICO's "distinctness" requirement, the "person" must be distinct from the "enterprise." *See In re ClassicStar Mare Lease Litig.*, __ F.3d __, 2013 WL 3746220, *13 (6th Cir. July 18, 2013). In

---

[1] BOA claims that this case might overlap, and need to be consolidated with, an MDL in Massachusetts. Mtn. at 1 & n.1. Plaintiffs will address this in full if BOA moves to consolidate, but the cases allege different putative classes and have different claims.

- 2 -

2001, the Supreme Court clarified that a corporation is sufficiently distinct from its sole owner/employee to be an enterprise. *See Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161-163 (2001). And participants who act within the scope of their authority may qualify as a "person" distinct from the corporation if they "conduct[ ] the corporation's affairs in a RICO-forbidden way." *Id.* at 163. RICO, after all, was meant to protect the public not only from wholly illegal enterprises, but also from "those who would use [a legitimate enterprise] as a 'vehicle' through which 'unlawful ... activity is committed.'" *Id.* at 164-65.

Since *Kushner*, courts have found that corporate defendants combining with others – including its agents, its officers, or its attorneys – can comprise an enterprise sufficiently distinct from the corporate defendant itself. *See, e.g.*, *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361-62 (9th Cir. 2005); *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545, 575-76 (D.V.I. 2004) (holding defendant bank, its subsidiary, and two of its agents were sufficiently distinct from the alleged enterprise).

Earlier this year, the Sixth Circuit considered the effects of *Kushner* and other developments, and held that a corporate defendant (GeoStar), its owners, and two corporations it controlled and used as agents constituted a distinct RICO enterprise. *In re ClassicStar*, 2013 WL 3746220, *16. As here, defendants argued that because "the enterprise consisted only of GeoStar's agents, subsidiaries, and affiliates … GeoStar cannot be … both a RICO 'person' and the 'enterprise' whose affairs are conducted by that person." *Id*. The court rejected the argument because "corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity." *Id*.

Plaintiffs here have alleged numerous aspects of the enterprise that demonstrate its distinctness from BOA. Plaintiffs allege, for example, that BOA's actions were led by a group of mid-level executives, most of whom came from Countrywide. ¶¶ 71, 93, 114-19, 132, 248.

The executives, and the department they oversaw, enlisted Urban and other independent companies and law firms, each of which was given its own job to perform within the enterprise. ¶¶ 125, 248, 249. The outside agents each had their own other lines of business, but combined portions of themselves to form a distinct entity – separate from BOA's legitimate lines of business – with the goal of providing as few HAMP modifications as possible while giving BOA the appearance of HAMP compliance.

These "agents" in question here were not exclusive agents. As Urban itself says, "[i]n addition to supporting BOA's loss mitigation outreach efforts, Urban … provides numerous clients a variety of services …." Urban Mtn. at 2. Unlike cases finding *exclusive* agents not to be sufficiently distinct, courts have repeatedly held that an association-in-fact between a corporation and its *non-exclusive* agent satisfies RICO's distinctiveness requirement. *See, e.g., Gottstein v. Nat'l Ass'n for the Self Employed*, 53 F. Supp. 2d 1212, 1220 (D. Kan. 1999).[2]

BOA's blanket contention that a corporation can *never* form an enterprise with its own subsidiaries, employees, or agents is simply wrong. Rather, "the [distinctness] analysis is so fact-intensive that a generic test is difficult to formulate." *In re ClassicStar,* 2013 WL 3746220, *14. Nor do the cases BOA rely on support such an absolute position. Aside from being in serious doubt under current law (most were decided before *Kushner* and none take the case into account), they do not address facts like those alleged here. In all but two of the cases, the alleged enterprise consisted entirely of the defendant and its own subsidiaries and/or employees. *See Bd.*

---

[2] *See also, e.g., Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952, 959 (C.D. Cal. 2001) ("[m]erely acting as an agent at times does not negate the distinctiveness" of the enterprise separate from the RICO person); *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 458-59 (E.D. Pa. 2010) (rejecting the defendant's argument that the person and the enterprise were not distinct where title agents were "nonexclusive agents who work with different title insurance companies"); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d 1071, 1084-85 (S.D. Cal. 2006) (holding "the RICO 'person' and 'enterprise' here are distinct, because the alleged enterprise includes additional persons--the individual sales agents"); *Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595, 610 (E.D. Pa. 2010) (finding defendant and its non-exclusive title agents sufficiently distinct from the enterprise).

*of County Comm'rs v. Liberty Group*, 965 F.2d 879, 885 (10th Cir. 1992); *Switzer v. Coan*, 261 F.3d 985, 988 (10th Cir. 2001) (*pro se* claiming federal judiciary and its employees constituted an enterprise); *Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 223 F.R.D. 566, 600 (D. Kan. 2004); *Bumgarner v. Blue Cross & Blue Shield, Inc.*, 716 F. Supp. 493, 495-96, 499 (D. Kan. 1988). The two cases which are possibly broader are not only pre-2007 unpublished decisions that cannot be cited as precedent (10th Cir. R. 32.1), the dismissals were primarily based on the failure to plead an enterprise (or any other RICO elements) with any coherence. *See Dirt Hogs Inc. v. Natural Gas Pipeline Co. of Am.*, 2000 WL 368411, *2-3 (10th Cir. Apr. 10, 2000); *Dopp v. Loring,* 54 Fed. Appx. 296, 298 (10th Cir. 2002).

In *Dirt Hogs*, the court had to guess at what the alleged enterprise was and who was in it. 2000 WL 368411, *3. And while *Dirt Hogs* contains the quote BOA highlights, the quote is actually taken from *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) which *also* held "[t]his does not foreclose the possibility of a corporate entity being held liable as a defendant … where it associates with others to form an enterprise that is sufficiently distinct …. [A] section 1962(c) claim may be sustained where there is only a partial overlap between the RICO person and the RICO enterprise ...." *Id.*; *see also Cooke & Moses, LLC v. QSS-Engineered Sys. Grp., LLC*, 2007 WL 2463288, *6-7 (N.D. W. Va. Aug. 28, 2007) (questioning *Riverwoods'* holding regarding intra-corporate conspiracies in light of *Kushner*); *Bessette v. Avco Fin. Servs., Inc.*, 279 B.R. 442, 453-54 (D.R.I. 2002) (same).

In *Waddell & Reed*, the court looked at this same universe of law and concluded merely that it meant "a corporation cannot violate RICO absent an association with an entity other than itself." 223 F.R.D. at 600. That is *precisely* what Plaintiffs here allege – that BOA associated with entities other than itself or its employees.

BOA's "legitimate business" argument also falls flat. Plaintiffs do not allege that *all* of BOA participated in the enterprise, but that certain divisions (or parts of divisions) dealt with

HAMP modifications, and that only that portion of BOA engaged in a fraudulent scheme to *prevent* HAMP modifications. This is neither consistent with, nor exhaustive of the bank's "regular affairs." The divisions and executives that engaged in the enterprise are sufficiently distinct from the rest of BOA. *See Living Designs, Inc.*, 431 F.3d at 361-62 (DuPont is a large company that offers an array of products and services and, as such, is not wholly encompassed by the conduct specific alleged). *Cf. Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) ("The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued.").

**B.     Plaintiffs Have Sufficiently Pled Racketeering Activity. (Issue is DISPUTED)**

    **1.     Plaintiffs have pled a pattern of racketeering. (Issue is DISPUTED)**

Based on four cases from 1986 and 1989, BOA incredibly contends that Plaintiffs have not adequately stated a "pattern of racketeering activity" because they alleged one scheme with thousands of acts of racketeering. Mtn. at 7 & n. 4. Those cases were rendered forever moot in 1989 when the Supreme Court expressly rejected that reasoning, and held that all RICO requires is two acts of related racketeering activity independent of any alleged scheme; multiple schemes are not required. *See H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 234-35, 240-41, 249-50 (1989). Plaintiffs have satisfied this standard by pleading thousands or millions of related acts of mail and wire fraud, and extortion. *E.g.,* ¶¶ 252-68.

    **2.     Plaintiffs have pled predicate acts of extortion. (Issue is DISPUTED)**

BOA contends it cannot be held to have extorted funds from Plaintiffs Leavitt, Gordon, and Dalton because they were merely collecting debts that Plaintiffs owed. This argument ignores both controlling law and the facts alleged.[3]

---

[3] BOA also claims there is no allegation that the transactions involved interstate commerce. Mtn. at 8 & n.5. To the contrary, BOA is a massive bank headquartered in North Carolina, and worked with Urban, which operated out of Colorado and Pennsylvania. ¶¶ 18, 19. The named Plaintiffs live in Washington, New Hampshire, and Nevada. ¶¶ 15-17. This on its face is

A defendant commits extortion when it wrongfully uses threats or fear to collect money from a victim, even if the defendant is using those threats to collect a debt that was owed. *See, e.g.,* 18 U.S.C. § 1951(b)(2); *U.S. v. Warledo*, 557 F.2d 721, 729 (10th Cir. 1977); *Robbins v. Wilkie*, 433 F.3d 755, 768-70 (10th Cir. 2006), *rev'd on other grounds*, 551 U.S. 537 (2007). The fundamental question is whether the act of collecting the debt was wrongful. *See id.*

Extortion allegations can be based on a fear of economic loss. *See U.S. v. Lotspeich*, 796 F.2d 1268, 1269-71 (10th Cir. 1986). All that is required is that a defendant has the power to hurt the victim, and that the victim believes that power exists. *See U.S. v. Ruedlinger*, 990 F. Supp. 1295, 1301 (D. Kan. 1997). The threat of using that power is actionable if it is an "inherently wrongful" abuse of that power. *Gillmor v. Thomas,* 490 F.3d 791, 799 (10th Cir. 2007).

Plaintiffs have pled both that BOA (1) collected amounts to which it was not entitled, and (2) did so wrongfully as part of a pattern of using its economic power and the HAMP program to coax borrowers into default or to increase their default. Specifically, Plaintiffs allege Defendants used HAMP to convince borrowers to make lower payments with the promise of a HAMP modification, thereby putting the borrowers in default – or further in default on their mortgages. BOA and its agents then threatened foreclosure if they did not accept a modification less advantageous than a HAMP modification. ¶¶ 57, 266, 268. Borrowers were thus forced to pay additional amounts or incur additional debt (through increased fees and higher interest) they would not have paid or incurred as part of their original mortgage, or if they had received a HAMP modification. ¶¶ 56, 265. Plaintiff George was told to make a lesser trial payment pursuant to HAMP, and was almost immediately told he was in default and had to pay $8,000 to avoid foreclosure. ¶¶ 166-67, 191. Plaintiff Dalton was told to make lower payments under HAMP. He did as instructed for several months, but Defendants delayed. ¶¶ 201-05. After

---

enough to establish interstate commerce for the purposes of extortion. *See U.S. v. Boston*, 718 F.2d 1511, 1516-17 (10th Cir. 1983). By contrast, all of Defendants' cases involved extortion between residents of the same state.

months of cat-and-mouse games, Defendants threatened Dalton with foreclosure, forced him into a less-advantageous non-HAMP trial plan, and increased his loan balance by $40,000 due to his having made lower payments at Defendants' instruction – an amount he would not have incurred had he received a timely HAMP modification. ¶¶ 208-09, 217. Defendants similarly instructed the Leavitts to make lower payments for months, thereby increasing their default and loan balance, before finally demanding they sign a secondary note for $12,000 to avoid foreclosure. ¶¶ 153-54. Though the Leavitts returned signed documents on November 16, BOA sold their mortgage to another servicer who claimed the loan was still in default and demanded the Leavitts take on a second mortgage with a balloon payment of $19,000. ¶¶ 157-58.[4]

These acts constitute extortion: wrongful increases in indebtedness followed by a wrongful use of fear to collect it. And to the extent that there is a dispute about whether this use of BOA's economic power was "wrongful," that is a factual dispute for the jury to decide. *See, e.g., Robbins*, 433 F.3d at 770.

BOA argues that these actions could never be wrongful, but the cases it cites are inapposite; none concerned allegations of a wrongful scheme to increase indebtedness in order to make the later threats more effective. *See Scheidler v. NOW, Inc.*, 537 U.S. 393, 400-02 (2003) (simply holding that extortion must result in a transfer of property); *Dost v. Nw. Tr. Servs.,* 2011 WL 6794028, *12 (D. Or. Dec. 21, 2011) (there was no allegation of transfer of property, and no allegation of a wrongful scheme); *Zander v. ACE Mortg. Funding LLC*, 2012 WL 601896, *3 (C.D. Cal. Feb. 23, 2013) (same); *Book v. MERS*, 608 F. Supp. 2d 277 (D. Conn. 2009) (same).[5]

---

[4] BOA claims the transfer of service means there is no allegation that it actually received any money from the Leavitts and there was no extortion by BOA. But the extortion statute which constitutes a RICO predicate act, 19 U.S.C. § 1951(a), explicitly applies to both successful and *attempted* extortion. Thus, even if BOA's actions only constituted attempted extortion, they still caused the Leavitts harm, because it led the next servicer to collect what BOA was extorting.

[5] BOA's citation of *U.S. v. Reagan*, 725 F.3d 471, 484 (5th Cir. 2013) also misses the mark. Plaintiffs are not alleging loss of some intangible future economic benefit; they are alleging that they suffered tangible, present economic loss due to Defendants' extortion.

### 3. Plaintiffs have pled predicate acts of fraud. (Issue is DISPUTED)

BOA claims Plaintiffs have not adequately pled acts of mail or wire fraud, but BOA is mistaken. BOA does not challenge every fraud allegation, and it apparently seeks to apply Rule 9(b) to some statements. But as this Court has recognized, Rule 9(b) "serve[s] two purposes: (1) to afford a defendant fair notice of a plaintiff's claims and the factual grounds upon which those claims rest, and (2) to safeguard a defendant's reputation from irreparable damage due to improvident charges of wrongdoing." *See Schaffer v. Evolving Sys., Inc.*, 29 F. Supp. 2d 1213, 1219 (D. Col. 1998) (citing *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992)). Those goals are served, as they are here, when a plaintiff specifies "the parties, the dates, the content of the communications, how they were allegedly fraudulent and how they furthered the fraudulent enterprise." *Tal v. Hogan*, 453 F.3d 1244, 1265 (10th Cir. 2006).

BOA's primary argument appears to be that Plaintiffs have not pled that certain misrepresentations constitute mail or wire fraud, but all that is required to establish mail or wire fraud is (1) "a scheme or artifice to defraud," (2) use of the mails or wires to facilitate that scheme, and (3) evidence of intent. *See U.S. v. Cronic*, 900 F.2d 1511 (10th Cir. 1990); *U.S. v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997). It is not necessary in establishing a scheme to defraud to show that there was an affirmative representation, *see Cronic*, 900 F.2d at 1513-14; all that is required is evidence that the defendant engaged in conduct "intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." *Cochran*, 109 F.3d at 664. This can be established by evidence of statements made with a reckless indifference as to their truth or falsity, or by evidence of deceitful concealment of material facts. *Id.* at 665.

Plaintiffs have detailed an overall scheme to actively deny HAMP modifications, and to string borrowers along. This includes, for example, designing systems to make it appear borrowers had not sent in documents, intentionally delaying decisions on modifications for months or years, wrongfully denying modifications, and conducting "blitzes" in which modifications would be wrongfully denied by the thousands. ¶¶ 59-71, 94-125.

It was this backdrop that made Defendants' communications with Plaintiffs misleading, deceptive, and fraudulent. Those communications made it appear as though homeowners who complied with HAMP would receive a permanent modification and included: letters instructing homeowners as to how to apply for HAMP modifications; websites misstating the availability of HAMP modifications for qualifying borrowers; phone calls in which Defendants misrepresented the true nature of the HAMP process; notices claiming borrowers failed to provide information; trial-payment agreements that led borrowers to believe HAMP modifications would be provided in good faith; and wrongful notices of denial of permanent modifications. ¶ 123.

Plaintiffs have provided the date and quoted from misleading statements they received through the mail, and explained why the statements were deliberately misleading. For example, each Plaintiff received initial application letters and trial plans that deliberately gave the impression they qualified for HAMP and that, if they provided documents and made reduced trial payments, they would receive a HAMP modification. ¶¶ 141, 148 (Leavitt); ¶¶ 169, 172 (George); ¶¶ 211, 217 (Dalton). Each of these written representations were calculated to deceive each Plaintiff into making lower payments, and going deeper into default, because they believed they would receive a HAMP modification if they made their payments. ¶¶ 142, 149 (Leavitt); ¶¶ 170, 173 (George); ¶¶ 213, 218 (Dalton). These statements were misleading in light of the meticulously constructed enterprise. *Id.* BOA claims these documents were not misleading but, as BOA admits, the trial plans stated that if the borrowers qualified, made their payments, and provided documentation, the modification "***will become permanent***." Mtn. at 8. This is a deliberately fraudulent statement issued by an enterprise created for the express purpose of denying as many modifications as possible, on whatever grounds were most convenient.[6]

---

[6] BOA contends that the TPPs and the cover letters cannot support a mail or wire fraud allegation because they did not actually promise anything. They are wrong, as discussed in greater detail in section III.C, *infra.*

The FAC also alleges, with regard to each Plaintiff, the dates of phone conversations the Plaintiffs had with Defendants' representatives, other mailings they received, the content of those communications, the reasons the communications were misleading, and in many cases the identity of any individual person involved. ¶¶ 136-39,[7] 144-45, 146[8], 151, 160 (Leavitt); ¶¶ 175, 177, 181, 188, 190 (George); ¶¶ 195,[9] 197,[10] 198, 200, 202, 205, 206 (Dalton). While BOA complains that some statements do not specifically identify telephone representatives by name, Mtn. at 10-11, the FAC provides the date and subject matter of each phone call, as well as the substance of each contact, and why it was false. This is more than sufficient to place Defendants on notice of Plaintiffs' claims and protect them from inaccurate statements of fact. *See Schaffer*, 29 F. Supp. 2d at 1219. This is especially true in a case like this, where Defendants keep

---

[7] BOA claims ¶ 139 is insufficiently pled, Mtn. at 10, but ¶ 139 alleges simply that the promise that customer relationship managers (CRMs) would provide "continuous status updates" was fraudulent because Defendants knew it was functionally impossible for CRMs to provide continuous status updates given their case loads. BOA's claim that the size of CRM caseloads is "irrelevant" to whether they could ever provide continuous status updates defies common sense.

[8] BOA claims ¶ 146, an allegation that it was a false representation that the Leavitts were not eligible for a HAMP modification, is unsupported because there is no allegation that the Leavitts were actually qualified for HAMP. But the FAC makes clear that just one month later, BOA determined that the Leavitts were in fact qualified for HAMP, yet another example of the endless campaign of fraud and confusion borrowers encountered. *See* ¶ 148.

[9] BOA claims this statement is insufficiently pled as false because Plaintiffs have not specified the HAMP guideline that was misrepresented. Mtn. at 11. This is incorrect. The complaint notes that HAMP is available for borrowers who are already behind on payments, *or* who are at risk of falling behind. ¶ 32 (eligibility includes those for whom "default is 'reasonably foreseeable'"); *see also* ¶ 42 (BOA's website requires only that the mortgage payment "is not affordable due to a financial hardship that can be documented").

[10] BOA claims ¶ 197 (and similar allegations in ¶ 200) is insufficiently pled because it merely shows contradictory statements by its representatives about whether a file had been opened. Mtn. at 10. First, discovery will show which of the two was false. But it is also a prime example of how Defendants used confusion to keep borrowers making lower payments as long as possible without ever offering them a permanent modification. This illustrates the general allegations about the enterprise that demonstrate why these statements are part of a deliberate attempt to mislead borrowers. It is that context which distinguishes this allegation from those in the cases defendants cite on p. 10 of their motion, all of which simply alleged contradictions without context. *See, e.g., Freitas v. Wells Fargo Home Mortg.,* 2011 WL 5524913, *3 (W.D. Mo. Nov. 14, 2011); *Pugh v. Bank of Am.*, 2013 WL 3349649, *15 (W.D. Tenn. July 2, 2013); *Butler v. Wells Fargo Bank, N.A.,* 2013 WL 3816973, *5 (D. Md. July 22, 2013).

databases of all contacts, and can easily research Plaintiffs' particular allegations to see which representative made which statement. ¶¶ 82, 104.

The FAC also reproduces webpages that BOA maintained in 2009 and 2011, which stated that borrowers who made their payments, returned documents, and qualified for HAMP would receive permanent modifications. ¶¶ 43-46. As the FAC makes clear, in the context of the overall enterprise and scheme, these websites were calculated to deceive persons of ordinary prudence or comprehension into believing that if they sent in documents, and made their trial payments, they would be offered a modification.

While BOA also claims that Plaintiffs have failed to sufficiently allege intent, that is wrong. Rule 9(b) does not create a heightened pleading standard for intent. *See* Rule 9(b); *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1252 (10th Cir. 1997). In any event, Plaintiffs have nonetheless pled that Defendants fully intended to wrongfully deny HAMP modifications to thousands of borrowers. This includes facts such as intentionally understaffing HAMP underwriting and consumer-relationship divisions, ¶¶ 61, 67, 74, 75, creating a "black hole" for borrower documents, ¶¶ 65, 94, 95, instructing employees to lie to borrowers, ¶¶ 61, 63, directing employees to deny modifications under any pretexts, ¶¶ 66, 67, 70, 92, 103, 105, 107, 108, 121, ordering underwriters to delay reviewing files in order to increase borrower defaults and "age" documents, ¶¶ 64, 66, and providing bonuses to employees who declined the most modifications, ¶ 70. *See also* ¶¶ 252-68. In addition, Plaintiffs have alleged that the communications made to them personally were knowingly and intentionally fraudulent. *E.g.,* ¶¶ 142, 146, 149, 160, 170, 173, 176, 177, 188, 198, 200, 206, 213, 218, 222.

**C.     Plaintiffs Sufficiently Pled a Promissory Estoppel Claim.  (Issue is DISPUTED)**

BOA's arguments regarding Plaintiffs' promissory estoppel claim are baseless. First, BOA remarkably contends that because the trial plans in question might be "agreements," Plaintiffs do not have a promissory estoppel claim. Mtn. at 13. Yet promissory estoppel claims

are only barred on the basis of an agreement when the agreement is a binding contract. *See, e.g., Braddock Fin. Corp. v. Wash. Mut. Bank*, 637 F. Supp. 2d 924, 933 (D. Colo. 2009); *Echostar Satellite, LLC v. Splash Media Partners, LP*, 2010 WL 3873282, *9 (D. Colo. Sept. 29, 2010). Plaintiffs have not alleged that there is a binding contract, and BOA surely is not conceding it, therefore the promissory estoppel claim is not barred.

BOA is also wrong that it made no promise. The Leavitt Trial Period Plan ("TPP") and its cover letter state: (1) "[a]fter you successfully complete your Trial Period Plan by making monthly payments and returning the Trial Period Plan Agreement, we *will send* you documentation that describes all of the terms of your permanent loan modification;" (2) if the Leavitts are in compliance with the TPP, BOA "*will provide* … a Partial Claim and FHA-Home Affordable Modification Agreement," and (3) if the Leavitts are in compliance, BOA "*will send* me a Partial Claim, which *will cure* my default, and a Modification Agreement for my signature." ¶ 148. The George TPP and cover letter have extremely similar representations. ¶ 172 ("After you successfully complete your Trial Period Plan by making timely payments and returning the Trial Period Plan Agreement, [BOA] *will send* … [an] FHA-Home Affordable Modification Agreement that you will need to sign and return before your loan will be permanently modified"; following successful completion of TPP, BOA "*will provide*" a modification agreement).

What is this language, if not a promise to provide an offer of a permanent modification upon confirmation that borrowers qualified, made their payments, and sent in their documents? While some district courts have held that similar language was not a promise, the three Circuit Courts to consider the question all concluded that agreements containing similar "will provide" language do promise to provide permanent modifications to borrowers who meet HAMP qualifications. *See, e.g., Young v. Wells Fargo Bank, N.A.,* 717 F.3d 224, 234 (1st Cir. 2013) (HAMP contract stated, if borrower "is in compliance … and [her] representations … continue to

- 13 -

be true," lender "will provide" a permanent modification offer); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 558, 561-63 (7th Cir. 2012) (same language; "an objectively reasonable person would construe it as an offer to provide a permanent modification agreement if she fulfilled its conditions"); *Corvello v. Wells Fargo Bank, N.A.*, __ F.3d __, 2013 WL 4017279, *2, 5-6 (9th Cir. Aug. 8, 2013) (same language, following *Wigod*).

To hold that the trial plans do not make any such promise would be to turn "an otherwise straightforward [promise] into an illusion." *Wigod*, 673 F.3d at 563. And thus Plaintiffs have alleged that the TPPs promise borrowers that if they make their payments and otherwise qualify for HAMP, they will receive an offer of a permanent modification. ¶ 277. This promise necessarily has embedded in it the implied promise that BOA would act in good faith.

Plaintiffs similarly allege that Dalton was promised that BOA would permanently modify his mortgage if he made his trial payments on time. ¶ 208. Dalton relied on this promise and made his trial payments. ¶ 209. Indeed, BOA induced Mr. Dalton to make trial payments with promises in two more trial plans without following through on their promises in a game that would be comical were it not so venal. ¶¶ 211-13, 215-17.

If BOA contends it was not foreseeable that borrowers would rely on their representations, the Court should disregard the argument. The promises were a lifeline to borrowers either in default, or at imminent risk of default. ¶¶ 30, 33, 135, 165, 194. As BOA admits, by the time an FHA TPP arrived at a borrower's doorstep, BOA had already reviewed borrower documents and confirmed the borrower eligible for a modification. Mtn. at 10; *see also* ¶¶ 32, 33, 43, 46. Given what the TPPs said, there was essentially nothing left to do aside from making trial payments. It was foreseeable, and expected, that borrowers would rely on the promises in the TPP. ¶¶ 278-79.

The borrowers' reliance was to their detriment. BOA's promises pushed Plaintiffs and other borrowers into default, or further into default, as a result of the lower payment. BOA then

dragged its feet and ultimately denied modifications, thereby placing Plaintiffs and others at risk of foreclosure, past-due interest, increased harm to their credit, and increased fees. ¶¶ 151, 154, 162, 175, 189, 191, 192, 281.  Further, because of the promise of a modification, Plaintiffs and others forewent other avenues of addressing their situation, such as entering a short sale.  ¶ 279.

This is real, tangible detriment as recognized by numerous courts.  *See, e.g.*, *Wigod*, 673 F.3d at 566; *Dill v. American Home Mortg. Serv., Inc.*, __ F. Supp. 2d __, 2013 WL 1292404, *3 (D. Mass. Mar. 28, 2013); *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 795 (2013); *Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 336, 340 (D. Mass. 2011); *Allen v. CitiMortgage, Inc.*, 2011 WL 3425665, *8 (D. Md. Aug. 4, 2011).  While BOA cites numerous cases for its argument about detrimental reliance, those cases dealt primarily with the argument that simply making a lower payment is not an adequate showing of reliance.  Mtn. at 13-14.  None of those courts were faced with allegations like those here – that the plaintiffs suffered detriment when they made lower payments because they both increased their indebtedness and the risk that they would be foreclosed upon.  *E.g.,* ¶ 281.  They are thus inapposite.

### D. The Court Should Grant Leave to Amend If It Dismisses All or Part of the FAC.

Plaintiffs request that they be given leave to amend if the Court finds merit in BOA's motion.  Plaintiffs refer the Court to pages 14-15 of their opposition to Urban's motion.

Respectfully Submitted: October 7, 2013          Hagens Berman Sobol Shapiro LLP

By: */s/Steve W. Berman*
    Steve W. Berman

Craig R. Valentine                                                   Tyler Weaver
Hagens Berman Sobol Shapiro LLP              Ari Y. Brown
2301 E. Pikes Peak Avenue                            1918 8th Avenue, Suite 3300
Colorado Springs, CO 80909                         Seattle, WA  98101
719.635.0377 (p) / 719.635.2920 (f)                206.623.7292 (p) / 206.623.0594 (f)
craigv@hbsslaw.com                                       steve@hbsslaw.com
    tyler@hbsslaw.com
    ari@hbsslaw.com

**CERTIFICATE OF SERVICE**

On October 7, 2013, I caused to be electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

- Ari Y. Brown
  ari@hbsslaw.com, dawn@hbsslaw.com
- James W. McGarry
  jmcgarry@goodwinprocter.com
- Keith Eric Levenberg
  klevenberg@goodwinprocter.com, keithlevenberg@yahoo.com
- Martin Christopher Bryce, Jr.
  bryce@ballardspahr.com, adamsg@ballardspahr.com
- Peter John Korneffel, Jr.
  korneffel@bryancave.com, jamie.pierson@bryancave.com, katie.debord@bryancave.com, loraine.street@bryancave.com, peter.korneffel@bryancave.com, rbower@bhfs.com
- Sarah Block Wallace
  wallaces@ballardspahr.com, andersonre@ballardspahr.com, mosesk@ballardspahr.com, roehrsh@ballardspahr.com
- Steve W. Berman
  steve@hbsslaw.com, dawn@hbsslaw.com, heatherw@hbsslaw.com
- Tyler Stuart Weaver
  tyler@hbsslaw.com, dawn@hbsslaw.com

Hagens Berman Sobol Shapiro LLP

By: */s/Steve W. Berman*
    Steve W. Berman