IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-01819-PAB-KLM

RICHARD GEORGE,
STEVEN LEAVITT,
SANDRA LEAVITT,
DARRELL DALTON,
and all others similarly situated,

      Plaintiffs,

v.

URBAN SETTLEMENT SERVICES, d/b/a Urban Lending Solutions, and
BANK OF AMERICA, N.A.,

      Defendants.

_____

**ORDER**
_____

This matter is before the Court on the Motion to Dismiss the First Amended

Class Action Complaint [Docket No. 13] filed by defendant Urban Settlement Services

("Urban") and the Motion to Dismiss the First Amended Class Action Complaint [Docket

No. 14] filed by defendant Bank of America, N.A. ("BOA").[1]  This Court has subject

matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332(d).

---

[1]BOA formerly did business under the name BAC Home Loans Servicing, LP.  All
references to BOA are to Bank of America, N.A. and BAC Home Loans Servicing, LP
collectively unless otherwise indicated.

## I. BACKGROUND[2]

This case arises out of BOA's and Urban's administration of the Home Affordable Modification Program ("HAMP").  Plaintiffs Richard George, Steven and Sandra Leavitt, and Darrell Dalton all obtained home mortgages that were held by Countrywide Home Loans.  Docket No. 12 at 53, ¶ 134, *id.* at 62, ¶ 163, *id.* at 69, ¶ 193.  BOA purchased Countrywide Home Loans in 2008 and acquired hundreds of thousands of mortgages, including those of plaintiffs.  *Id.* at 10, ¶ 23.  Pursuant to a contract between BOA and Urban, Urban provided HAMP-related services to BOA.  *Id.* at 35, ¶ 78.  On behalf of themselves and a nationwide class, plaintiffs bring a claim against BOA and Urban under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).  *Id.* at 82-92.  Plaintiffs' RICO claim alleges that BOA and Urban were part of an enterprise that engaged in mail and wire fraud and extortion.  *Id.*  On behalf of themselves and statewide classes of similarly situated borrowers, plaintiffs also bring a claim against BOA for promissory estoppel.  *Id.* at 92-93.

### A.  HAMP

In response to the foreclosure crisis, the federal government launched HAMP in 2009, which attempted to give mortgage servicers an incentive to modify loan terms for delinquent borrowers.  Docket No. 12 at 11, ¶ 25.  HAMP provided a vehicle by which

---

[2]The following facts are taken from plaintiffs' First Amended Class Action Complaint (the "amended complaint") [Docket No. 12].  Plaintiffs' factual allegations are presumed true unless, as noted herein, they are conclusory or contradicted by other allegations of plaintiffs.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) ("conclusory and formulaic recitations" of the elements "are insufficient to survive a motion to dismiss"); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 152 (2d Cir. 2014) (holding that "general allegations that are contradicted by more specific allegations in the Complaint" need not be accepted as true (quotation omitted)).

borrowers could initially make lower monthly payments, thereby decreasing the risk of default and the instances of foreclosure.  *Id.* at 12, ¶ 28.  For each successful HAMP modification, servicers were paid $1000 by the federal government.  *Id.* at 22, ¶ 50. The HAMP program was largely successful for those borrowers receiving HAMP modifications.  *Id.* at 13, ¶ 29.  HAMP was administered by the United States Treasury Department; banks who accepted funds through the Troubled Asset Relief Program were required to participate.  *Id.* at 12, ¶ 27.  Participating banks entered into a Servicer Participation Agreement (the "Agreement") with the Treasury Department at which point the bank became a Participating Servicer.  *Id.* at 12-13, ¶¶ 27, 30.  Under the Agreement, Participating Servicers were required to evaluate for HAMP eligibility all loans that were more than 60 days delinquent or appeared to be in imminent default. *Id.*  If a borrower contacted the Participating Servicer regarding HAMP, the servicer was required to collect income and hardship information to determine HAMP eligibility.  *Id.* at 13-14, ¶ 30.

The HAMP process has two steps.  At step one, the servicer evaluates the borrower based upon information the borrower provides, determining if each of the threshold eligibility requirements is met and if modification would provide the mortgage holder a net present benefit.  If the threshold eligibility requirements are met, the borrower is placed on a Trial Period Plan ("TPP"), which is a three-month period that allows the servicer to verify the borrower's information.  *Id.* at 14-15, ¶ 32-34.[3]  The Treasury Department expected servicers to reach a decision as to whether to extend a

_____

[3]Servicers are prohibited from initiating or continuing foreclosure proceedings while the evaluation process and trial period are ongoing.  *Id.* at 16, ¶ 36.

TPP to a borrower within 30 days of receiving the borrower's financial documents for 95% of submissions. *Id.* at 53, ¶ 132. The TPP's terms and conditions are explained in an FHA Home Affordable Modification Trial Period Plan ("TPP document") provided to the borrower, which both the borrower and the loan servicer are required to sign. *See, e.g.*, Docket No. 14-2; Docket No. 14-3.[4] If the borrower complies with the TPP, makes all monthly payments, and the servicer verifies the borrower's information, then process proceeds to step two, which requires that the servicer make an offer of permanent modification if the borrower has met the required conditions. Docket No. 12 at 15-16, ¶ 35.[5]

## B. BOA's Implementation of HAMP

As a recipient of Troubled Asset Relief Program funds, BOA was required to participate in HAMP. In April 2009, BOA signed a Servicer Participation Agreement with the Treasury Department and began administering the HAMP program to borrowers. *Id.* at 12, ¶ 27. BOA contracted with third parties, including Urban, to provide services related to its implementation of HAMP. *Id.* at 35, ¶ 78. BOA represented publicly that it was participating in HAMP and that qualifying homeowners would be able to secure a permanent loan modification. *Id.* at 18, ¶ 41. A BOA

---

[4]Because these documents are explicitly referenced in the amended complaint and are central to plaintiffs' claims, *see* Docket No. 12 at 64, ¶ 172, the Court can consider them without converting BOA's motion into a motion for summary judgment. *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

[5]In March 2010, the Treasury Department changed the process, requiring servicers to verify borrowers' financial information prior to instituting TPPs. *Id.* at 16, ¶ 38.

executive testified before Congress that efforts to place borrowers in the HAMP program were hindered by borrowers' failure to provide financial information and failure to respond to outreach efforts, statements which plaintiffs claim were knowingly false. *Id.* at 26-27, ¶ 59.   However, BOA also offered internal or proprietary non-HAMP modification programs, which were more profitable for BOA.  *Id.* at 25, ¶ 56.  Privately, BOA supervisors were told that the more the HAMP process was delayed, the more fees BOA would collect and the more borrowers would be directed towards proprietary modification programs.  *Id.* at 25, ¶¶ 55-56.  Thus, BOA instituted a practice of delaying the HAMP application process, implemented by regional vice presidents, including executives Rebecca Mairone, John Berens, Kenneth Scheller, Troy Novotny, Patricia Feltch, and Tyrone Wells.  *Id.* at 27, ¶¶ 60-61, at 31, ¶ 71.  Former BOA employees stated that BOA did not have sufficient underwriting staff to implement the program and complete review of borrowers' documents within the 30 days of submission.  *Id.* at 27, ¶¶ 60-61.  A former employee stated that BOA executives knowingly failed to provide sufficient underwriting staff to process all of the incoming HAMP applications.  *Id.* at 28, ¶ 62.  By early 2012, the average case load size for a customer relationship manager was 600 loans.  *Id.* at 34, ¶ 74.  BOA employees were instructed to inform applying borrowers that their application documents had not been received, to hold application documents for 30 days, or to scatter application documents so that the documents could not be viewed on a single system.  *Id.* at 28-30, ¶¶ 63-65.  In some instances, BOA would order borrowers' applications denied "for no reason other than that the borrower documents were more than 60 days old."  *Id.* at 30, ¶ 66.  For those

applications that were considered, BOA failed to properly employ the HAMP-mandated qualifications. *Id.* at 30, ¶ 68. In some instances, BOA offered managers and employees rewards based upon the number of homeowner applications they could decline. *Id.* at 31, ¶ 70. In 2010 and 2011, the United States Office of the Comptroller of the Currency evaluated BOA's practices and, on March 29, 2011, BOA executed a consent decree, wherein BOA agreed to implement remedial measures to correct issues in its loan modification process. *Id.* at 32-34, ¶ 73. Plaintiff claims that BOA failed to comply with its obligations under the consent decree, including failing to lessen the case load of its customer relationship managers. *Id.* at 34, ¶¶ 74-76.

### C. Urban

Urban maintained offices and a corporate identity separate from BOA. *Id.* at 35, ¶ 80. Plaintiff claims that BOA assigned Urban specific tasks and broad duties to manage, that Urban communicated regularly with BOA, and that both entities were engaged in the common goal of reducing the number of HAMP modifications issued to borrowers. *Id.* at 36, ¶ 82. Urban was compensated based upon the volume of loan files it processed. *Id.* at 37, ¶ 87. Within parameters set by BOA, Urban performed key functions related to BOA's implementation of HAMP, including deciding, based upon BOA criteria, "which modification program a particular borrower should be steered toward, and deciding which borrowers should be denied modifications in order to meet quotas and timeframes." *Id.* at 35-36, ¶¶ 80-81, 83. BOA also directed Urban to receive financial documents from borrowers, field telephone inquiries from borrowers, and notify borrowers when required documents were missing. *Id.* at 37, ¶¶ 84-86.

Although borrowers believed that they were returning financial documents to BOA, the address and fax number BOA provided borrowers was a Urban address and fax number.  *Id.* at 37, ¶ 88.  Urban employees fielding calls from borrowers would represent themselves as BOA employees and were given titles and email addresses suggesting that they were BOA employees.  *Id.* at 37-38, ¶ 89.  BOA executives were aware of the problems with Urban's role in implementing HAMP, but made no effort to correct its own or Urban's performance.  *Id.* at 38, ¶ 93.

### D.  The Enterprise

Plaintiffs claim that BOA and Urban were part of an enterprise (the "enterprise") with the goal of furthering a fraudulent scheme to keep borrowers from acquiring permanent HAMP loan modifications.  Plaintiffs claim that BOA's TPP documents induced borrowers to make trial payments with the expectation that they would receive a permanent modification.  *Id.* at 17, ¶ 38.  Plaintiffs claim that Urban served as a "black hole" for borrowers' HAMP-related documents, effectively guaranteeing that TPPs would not be converted to permanent modifications.  *Id.* at 39, ¶ 94.  At BOA's direction, Urban delayed forwarding modification packages, falsely informed inquiring borrowers that their loans were being processed, and falsely telling borrowers that their files were incomplete, requiring the borrowers to send additional documents.  *Id.* at 39, ¶ 96.  For example, Urban was directed to close any file that contained a letter to the borrower seeking additional information, regardless of whether the borrower had provided the requested information.  *Id.* at 41, ¶ 100.  Despite the fact that BOA required that documents such as bank statements be less than 90 days old, Urban

would allow the documents to age until they could no longer be used in the underwriting process, at which point BOA would deem the documents unacceptable and deem the file incomplete.  *Id.* at 40, ¶ 97.  Pursuant to the TPP documents, BOA instructed borrowers to make temporary payments – in amounts lower than would ordinarily be due under their un-modified mortgages –, yet BOA continued to consider full, unmodified loan payments due from each borrower.  *Id.* at 40, ¶ 98.  Eventually, due to the delay in processing borrowers' TPPs, the borrowers' debt would continue to accumulate and rise to a level where BOA would decline the loan modification due to "excessive forbearance."  *Id.* at 40-41, ¶ 98.[6]  As a result of this "delay loop," plaintiffs claim that BOA and Urban fraudulently denied permanent loan modifications to tens of thousands of borrowers who had otherwise fulfilled their requirements under the TPPs.  *Id.* at 41, ¶¶ 99-100.

By the third quarter of 2012, BOA had approximately 20,000 unresolved complaints or service requests from borrowers.  BOA provided Urban with lists of service requests to close.  *Id.* at 41-42, ¶¶ 102-104.  Despite the fact that some of the service requests may have required follow-up work, BOA instructed Urban employee to close service requests as quickly as possible such that Urban employees were expected to close dozens of service requests per day and did so, in some cases, by

---

[6]In other words,
> Borrowers who participate in the HAMP program, and thus make lower payments as instructed by Defendants, are necessarily in default by virtue of making the lower payments.  This places already economically stressed borrowers in the extremely tenuous position of being in default on their original mortgage, but also unable to obtain a HAMP modification due to Defendants' scheme.

*Id.* at 25-26, ¶ 57.

deeming the borrowers to have failed the HAMP application process. *Id.* at 42, ¶ 105. Urban employees raised concerns to Urban executives regarding the manner in which service requests were being closed. Employees who did so were disciplined and the practice of improperly closing service requests continued. *Id.* at 43-45, ¶¶ 109-114. Plaintiffs allege that BOA executives Mr. Scheller, Ms. Mairone, Mr. Swain, and Ms. Feltch were repeatedly informed that BOA's application of HAMP was wrongfully denying a majority of borrowers' loan modifications, but that those individuals, along with BOA executives Robbie Nicholson, Tony Meola, and John Berens continued to direct a program of mass declinations. *Id.* at 45-56, ¶¶ 115-119.

As a result of BOA's and Urban's knowledge of their scheme of mass declinations, BOA and Urban made knowingly false statements to borrowers by mail, telephone, email, and over the internet, including: letters, website communications, TPP documents, and phone calls containing misleading representations regarding the availability of HAMP modifications, phone calls misrepresenting the status of borrowers' loan modifications, notices that application documents or information was missing, and notices of denial of permanent modifications. *Id.* at 47-48, ¶ 123.[7]

BOA used other entities to further its scheme. Sykes Enterprises, Inc. was retained by BOA to communicate with customers. Wingspan Portfolio Advisors was used by BOA to process customer efforts to secure loan modifications. Robertson

---

[7]BOA's website contained criteria and instructions for applying for HAMP through BOA. *Id.* at 18-21, ¶¶ 42-45. BOA's website stated, "You can expect to hear back from us within 10 business days from when we receive all your required documents." *Id.* at 21, ¶ 46. Plaintiffs claim that BOA's website was deceptive and misled borrowers into believing that, if they applied for HAMP, qualified for HAMP, and made trial payments, they would receive an offer of permanent modification. *Id.* at 21, ¶ 47.

Anschutz & Vetters and Robertson Anschutz & Schneed (the "law firms") were law firms BOA used to facilitate the foreclosure of homes once borrowers were denied loan modifications.  BOA retained Stewart Lender Services to mail and receive HAMP application documents.  *Id.* at 48-49, ¶ 125.

### E.  Plaintiffs' Modification Applications

#### 1. Mr. George

In 2007, Mr. George refinanced his mortgage with Countrywide.  *Id.* at 62, ¶ 164. In 2008, Mr. George's work hours were reduced.  *Id.* at 62, ¶ 165.  Mr. George contacted BOA about HAMP and was told to pay a modified amount.  Rather than receiving a TPP document, Mr. George received a Notice of Intent to Accelerate.  *Id.* at 62-63, ¶¶ 166-67.  Mr. George attempted to continue to pay the full amount of his mortgage payment.  *Id.* at 63, ¶ 168.  After receiving a letter from BOA directing him to submit documents for TPP consideration, Mr. George submitted all documents requested.  Unbeknownst to Mr. George, the address to which he sent the requested documents belonged to Urban.  *Id.* at 63-64, ¶¶ 170-71.  On June 24, 2010, Mr. George received a TPP document.  *Id.* at 64, ¶ 172.  Mr. George signed the TPP as instructed and returned it to the address belonging to Urban and thereafter fulfilled all the TPP requirements.  *Id.* at 65, ¶ 174-75.  Mr. George claims that the TPP document and BOA's website "indicated that Mr. George could expect a permanent modification within a month of the end of the trial period," but Mr. George received no such loan modification.  *Id.* at 65, ¶ 175.[8]  On several occasions, Mr. George attempted to contact

---

[8]With regard to this allegation and others like it, *see, e.g.*, *id.* at 76, ¶ 219, the amended complaint does not quote or otherwise refer to any specific language in the

BOA regarding the status of his HAMP modification and, on January 19, 2013, received a permanent modification agreement.  *Id.* at 66, ¶¶ 177-79.  Mr. George subsequently received conflicting representations from BOA regarding the status of his modification paperwork, but returned the signed paperwork to Urban's address as instructed.  *Id.* at 67, ¶¶ 181-185.  Despite this, on April 20, 2013, Mr. George received yet another set of modification papers.  *Id.* at 67, ¶ 186.  As a result of these interactions with BOA, Mr. George claims, among other things, to be living in constant risk of foreclosure, alleging that he relied on BOA's and Urban's misrepresentations regarding HAMP availability and that BOA demanded that Mr. George pay $8,000 before it would consider him for a HAMP modification.  *Id.* at 68, ¶¶ 187, ¶ 189, ¶ 191.  Mr. George claims that he was additionally harmed by being denied the benefit of a HAMP modification and through incurring additional debt and interest that would have been avoided had BOA timely placed him in a HAMP modification.  *Id.* at 69, ¶ 192.

### 2.  *Mr. and Mrs. Leavitt*

After experiencing financial difficulties, on July 21, 2011, the Leavitts contacted BOA, requesting a HAMP modification.  BOA represented that HAMP paperwork would be sent to them, but, after the Leavitts called BOA to follow up on the status of such paperwork, the Leavitts were unable receive any information.  *Id.* at 54, ¶¶ 135, 137.  Over the course of their interactions with BOA, the Leavitts were assigned multiple customer relationship managers ("CRMs"), each of whom was generally unreachable and lacked knowledge of the modification process.  *Id.* at 55, ¶ 140.  On November 3,

_____

TPP document or on BOA's website that indicates a permanent modification would be received within thirty days of the end of the trial period.

2011, the Leavitts received HAMP application materials, which they claim contained multiple misrepresentations. *Id.* at 55-56, ¶¶ 141, 142.  After returning the requested information to an address that, unbeknownst to the Leavitts, belonged to Urban, the Leavitts inquired of their CRM each week as to the status of their application. *Id.* at 56-57, ¶¶ 143-44.  The CRM falsely represented that their application was under review and the Leavitts were additionally instructed to resubmit documents. *Id.* at 57, ¶¶ 144-45.  On February 25, 2012, the Leavitts were informed that they were ineligible for a HAMP modification and again instructed to resubmit documents. *Id.* at 57, ¶ 146.  On March 30, 2012, the Leavitts received the TPP documents, setting a monthly payment amount that was improperly calculated, but indicating that if the TPP was successfully completed a permanent HAMP modification would be provided – statements the Leavitts claim were deceptive. *Id.* at 58, ¶ 148-49.   Despite representations that they could expect a permanent modification within 30 days after completing the TPP, the Leavitts were not offered a permanent modification after making the required payments. *Id.* at 59, ¶ 151.  The Leavitts were again assigned to different CRMs and were unable to get information on the status of their application, but eventually, in November 2012, received a permanent modification offer. *Id.* at 59, ¶¶ 152-53.  The modification was contingent on a $12,000 balloon payment due at the end of the mortgage term. *Id.* at 60, ¶ 153.  The Leavitts returned the modification agreement, but, before the modification was processed, the Leavitts' loan was sold to Nationstar Mortgage. *Id* .at 60, ¶¶ 155, 156.  According to Nationstar Mortgage, the Leavitts' payments during the TPP had been recorded as underpayments and showed that the Leavitts were in

default by more than $6,000.  *Id.* at 61, ¶ 157.  The Leavitts reapplied for HAMP

modification with Nationstar Mortgage and received a permanent modification in

approximately four months.  *Id.* at 61, ¶ 158.  The Leavitts claim that they suffered harm

in the form of $19,000 in additional debt, personal expenses from the time spent

following up on the modification application, and interest and fees that the Leavitts

would not have incurred had BOA and Urban acted within the timeframe set forth in

HAMP rules.  *Id.* at 61-62, ¶ 162.

### 3. Mr. Dalton

After losing his job, Mr. Dalton contacted BOA in May 2009 regarding a HAMP

modification.  *Id.* at 69, ¶ 195.  Mr. Dalton complied with BOA's request to provide

application documents, but, when contacting BOA to follow up on his application, was

told that his file was under review and did not contain the necessary documents.  *Id.* at

70, ¶¶ 196-98.  In September 2009, Mr. Dalton was advised by BOA that no file

regarding his modification application had been opened and was again instructed to

send in the required documents.  *Id.* at 71, ¶¶ 200-01.  On January 25, 2010, BOA

informed Mr. Dalton that his HAMP TPP had been approved and that he should begin

making trial payments; however, the TPP documents did not arrive.  *Id.* at 71-72, ¶ 202.

Throughout April, May, and June of 2010 Mr. Dalton received conflicting information

from BOA representatives regarding whether his TPP had been approved.  *Id.* at 72,

¶¶ 203, 205.  In late 2010, after receiving a notice of intent to foreclose, BOA and Mr.

Dalton entered into pre-foreclosure mediation, after which BOA and Mr. Dalton entered

into a written "internal modification" plan with a three-month trial period.  *Id.* at 73,

¶ 208.  After making his trial payments on time, Mr. Dalton was presented with a permanent modification that added $18,000 in interest and fees to the principal of his loan.  *Id.* at 73, ¶ 209.  Mr. Dalton refused the modification, at which point Mr. Dalton was placed in a second trial plan, but one which did not comply with the HAMP formula for calculating the monthly payment.  *Id.* at 74, ¶¶ 209, 211-212.[9]  Mr. Dalton believed that, if he made his trial payments on time, he would receive a permanent modification.  *Id.* at 74, ¶ 213.  On February 13, 2013, BOA sent Mr. Dalton a third trial plan, which also did not comply with the HAMP formula.  *Id.* at 75, ¶¶ 215-16.  After Mr. Dalton complied with the trial plan, BOA sent a permanent modification that added more than $22,000 to the loan principal.  *Id.* at 75, ¶ 217.  Mr. Dalton suffered injuries in the form of incurring additional debt that would not have been incurred had BOA and Urban provided him a timely permanent HAMP modification.  *Id.* at 77, ¶ 224.

## F.  Procedural History

On July 10, 2013, plaintiffs filed the present case.  Docket No. 1.  On August 26, 2013, plaintiffs filed the amended complaint.  Docket No. 12.  On September 16, 2013, Urban and BOA filed motions to dismiss, seeking dismissal of all claims asserted against them pursuant to Federal Rule of Civil Procedure 12(b)(6).  Docket Nos. 13 and 14.[10]

---

[9]The amended complaint does not indicate that Mr. Dalton received a HAMP TPP document for either the second or third trial plan.

[10]The amended complaint's class allegations are not at issue in the present motions and, as such, the Court will not restate them in this order.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).

## III.  ANALYSIS

### A.  RICO Claims

Plaintiffs bring their RICO claim pursuant to 18 U.S.C. § 1962(c).  "To successfully state a RICO claim, a plaintiff must allege four elements: "(1) [participation in the] conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).  Urban argues that plaintiffs' allegations fail to satisfy the first and fourth elements.  Docket No. 13 at 7, 10.  BOA argues that plaintiffs' allegations fail to satisfy the second and fourth elements.  Docket No. 14 at 3, 7.

#### 1.  Conduct

The Court first considers whether, with respect to Urban, plaintiffs have sufficiently alleged the first element.  To determine whether a defendant has

participated in the conduct of a RICO enterprise, the Supreme Court has adopted the

"operation or management" test.  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. . . . RICO liability is not limited to those with primary responsibility for directing the enterprise's affairs, just as . . . RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Id.* (quoting § 1962(c)) (emphasis in original); *see also BancOklahoma Mortg. Corp. v.*

*Capital Title Co., Inc.*, 194 F.3d 1089, 1100 (10th Cir. 1999).  "An enterprise is

'operated' not just by upper management but also by lower rung participants in the

enterprise who are under the direction of upper management."  *Reves*, 507 U.S. at 184.

Outsiders having no official position can nonetheless be held liable "if they are

'associated with' the enterprise and 'exert control over it.'"  *Gen. Steel Domestic Sales,*

*LLC v. Denver/Boulder Better Business Bureau*, No. 07-cv-01145-DME-KMT, 2009 WL

535780, at *22 (D. Colo. March 2, 2009), *amended in part on other grounds* 2009 WL

129270 (D. Colo. May 8, 2009) (quoting *Reves*, 507 U.S. at 184).  "'Simply because

one provides goods or services that ultimately benefit the enterprise does not mean that

one becomes liable under RICO.'"  *BancOklahoma*, 194 F.3d at 1102 (quoting *Univ. of*

*Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993)).

As a result, a plaintiff must allege that the RICO defendant did "more than provide their

regular services."  *Id.* at 1101.[11]

---

[11]The Tenth Circuit has recognized that interpretations of *Reves* differ slightly among the circuits, but has thus far declined to explicitly adopt another circuit's approach to the operation or management test.  *See United States v. Hutchinson*, 573 F.3d 1011, 1034 (10th Cir. 2009).  For example, in the Second Circuit, a defendant who does not have a managerial role must at least "exercise[] broad discretion in carrying

16

Plaintiffs do not appear to dispute that Urban acted under BOA's supervision and had no primary or formal responsibility for the alleged enterprise's affairs.  The Court's review of the amended complaint provides no basis to conclude otherwise.  *See Reves*, 507 U.S. at 179.  BOA entered into a contract with Urban to provide "HAMP-related ministerial services."  Docket No. 12 at 35, ¶ 78.  The amended complaint contains no allegations upon which to conclude that Urban employees had a role in setting the enterprise's agenda or otherwise exercised control over anyone but their own employees.  The amended complaint states that Urban effectuated the goals of the enterprise "[w]ithin parameters set by BOA."  *Id.* at 35, ¶ 80.  The acts complained of were assigned by BOA and carried out either at BOA's explicit direction or based upon criteria set by BOA.  Docket No. 12 at 36-39, ¶¶ 83-90, 94-96.  Moreover, "BOA demanded, and Urban provided, constant updates on virtually all aspects of work Urban performed."  *Id.* at 37, ¶ 86.  Thus, the question becomes whether, as an outside contractor having no official position within the enterprise, Urban is nonetheless liable for having an association with and exerting control over the enterprise.  *See General Steel*, 2009 WL 535780, at *22.

---

out the instructions of his principal" such that "the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)."  *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999).  The First Circuit has interpreted *Reves* more liberally, holding liable those who "'knowingly implement decisions' made by upper management."  *Hutchinson*, 573 F.3d at 1034 (quoting *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994)).  Neither party advocates for the application of the First Circuit's more liberal approach.  Instead, plaintiffs rely on the argument that Urban is liable based upon its ability to exercise discretion.  Docket No. 19 at 6.  As discussed below, plaintiffs' claim against Urban fails based upon existing Tenth Circuit precedent and therefore the Court need not speculate as to which interpretation of the operation or management test the Tenth Circuit would apply.

Plaintiffs argue that Urban participated in the alleged conduct of the enterprise because Urban had "discretion in how it carried out BOA's directions." Docket No. 19 at 6. Plaintiffs allege that BOA assigned Urban "specific tasks and broad duties to manage." Docket No. 12 at 36, ¶ 82. However, plaintiffs fail to plead facts that indicate what discretion Urban actually had and how it exercised such discretion in directing the enterprise. For example, the amended complaint states that Urban was given discretion to determine whether borrowers should be given HAMP or BOA proprietary modifications. Docket No. 19 at 6. However, BOA "assigned" this task to Urban and directed Urban to complete it "[u]sing BOA's criteria" and the amended complaint does not otherwise indicate what, if any, meaningful control Urban had in implementing BOA's criteria. Docket No. 12 at 36, ¶ 83. Plaintiffs refer to the fact that Urban communicated with thousands of BOA customers with regard to HAMP; however, this task and all those associated with it were assigned or directed by BOA. *Id.* at 37-38, ¶¶ 84-90. Plaintiffs rely on the fact that Urban created backlogs of documents and then denied modifications for borrowers' failure to provide the necessary documents. However, "*BOA* used Urban as a repository for borrower documents" and Urban's delay in forwarding modification packages was "[a]t *BOA's* direction." *Id.* at 39, ¶¶ 94-96 (emphasis added). Plaintiffs assert that Urban began closing modification files for false reasons, but admit that Urban did so to meet BOA's directive of "service requests that needed to be closed on a daily basis." *Id.* at 42, ¶ 104. Plaintiff also relies on the fact that Urban executives disciplined employees who did not meet the targets established by BOA, *id.* at 43-45, ¶¶109-114, but provides no factual basis for concluding that this discretion was anything more than what Urban would exercise in providing its regular

services to a customer if employees failed to meet that customer's expectations or

more than what BOA would ordinarily require from its contractors.  *See BancOklahoma*,

194 F.3d at 1101; *see also* Docket No. 12 at 31, ¶ 70 (describing "intense pressure

BOA placed on Urban and that Urban supervisors placed on employees to close files

as fast as possible").  Because plaintiffs have failed to allege facts indicating the scope

and degree of the discretion Urban exercised, plaintiffs fail to show that such discretion

rose to a level of directing the enterprise, as opposed to simply performing acts that

benefit the enterprise.  *See Handeen v. Lemaire*, 112 F.3d 1339, 1348 (8th Cir. 1997)

("Congress did not mean for § 1962(c) to penalize all who are employed by or

associated with a RICO enterprise, but only those who, by virtue of their association or

employment, play a part in directing the enterprise's affairs.").

    Plaintiffs also appear to rely on the fact that Urban executives knew that HAMP

applications were being wrongfully denied.  Docket No. 12 at 43-44, ¶¶109-113.

However, "'simply performing services for an enterprise, even with knowledge of the

enterprise's illicit nature, is not enough to subject an individual to RICO liability . . . ;

instead, the individual must have participated in the operation and management of the

enterprise itself.'"  *See General Steel*, 2009 WL 535780, at *22 (quoting *Goren v. New

Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998)).  In other words, to the extent Urban

operated within BOA's criteria, plaintiffs do not provide facts indicating that Urban's

ability to exercise such discretion amounted to a role in directing the enterprise's affairs.

*See Albright v. Attorney's Title Ins. Fund*, 504 F. Supp. 2d 1187, 1205 (D. Utah 2007)

("plaintiffs have failed to show that the Florida Fund did anything other than provide its

19

regular services"). Plaintiffs have failed to state a claim that Urban participated in the operation or management of the alleged RICO enterprise.

### 2. RICO Enterprise

The Court next considers whether, with respect to BOA, plaintiffs have sufficiently alleged the existence of an enterprise. The statutory definition of an "enterprise" is broad, encompassing "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).[12] As § 1962(c) makes clear, "it is required that the 'person' and the 'enterprise' engaged in racketeering activities be different entities." *Bd. of Cnty. Comm'rs of San Juan Cnty. v. Liberty Grp.*, 965 F.2d 879, 885 (10th Cir. 1992). Thus, the plaintiff in a RICO case must establish that "defendants were part of an enterprise which had an existence and purpose distinct from any one of them." *Id.* It is for this reason that "officers and employees of an organization cannot, in the ordinary course of their duties, constitute an association in fact separate from the organization itself." *Id.* at 886. Moreover, courts reject the notion that a corporation can conduct the affairs of a RICO enterprise "merely because it is a firm with agents or affiliates." *See Brannon v. Boatmen's First Nat'l Bank of Oklahoma*, 153 F.3d 1144, 1148 (10th Cir. 1998) (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323-24 (7th Cir. 1998)); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997). Rather, the defendant corporation "must be shown to use the

---

[12]An association in fact must have at least three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

alleged enterprise 'as the instrument of [its] criminality,' and the plaintiff must plead that the alleged enterprise 'somehow made it easier to commit or conceal the fraud of which the plaintiff complains.'" *Brannon*, 153 F.3d at 1148 (quoting *Emery*, 134 F.3d at 1324). In *Fitzgerald*, plaintiff brought a RICO claim against a car manufacturer, claiming that its subsidiaries and dealers participated in an enterprise to sell fraudulent warranties.  116 F.3d at 225.  The Seventh Circuit noted that the prototypical RICO case is one where "a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources . . . and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person."  *Id.* at 227.  The court rejected the notion that RICO applied to the manufacturer merely because it did business through agents, "as virtually every manufacturer does," noting that if the manufacturer had no agents, "but only employees . . . , it could not be made liable for warranty fraud under RICO."  *Id.*  The court held that plaintiff's claims failed to state that the manufacturer "established dealerships in order to fool car buyers into thinking that they are not dealing with the 'racketeer' [manufacturer], or to enable [the manufacturer] to engage in fraud on a scale that would be impossible if it internalized the dealership function."  *Id.* at 228.

BOA argues that plaintiffs' amended complaint fails to allege that BOA was distinct from the enterprise itself.  Docket No. 14 at 4.  Plaintiffs allege that the enterprise consisted, in part, of BOA and its subsidiary BAC Home Loans and BOA's employees.  Docket No. 12 at 83, ¶ 248.  However, the amended complaint contains no allegations that BAC Home Loans took actions separate from BOA and the involvement of a subsidiary in the parent corporation's affairs does not, by itself, render the RICO

enterprise distinct from the parent corporation.  *See Brannon*, 153 F.3d 1147-48.

Plaintiffs' amended complaint contains no allegations suggesting that BOA's employees

constitute an association in fact separate from BOA itself.  *Liberty Grp.*, 965 F.2d at

886.

Plaintiffs also allege that Urban and several of Urban's employees comprised the

enterprise in fact.  Docket No. 12 at 83, ¶ 248.  However, plaintiffs' amended complaint

contains no specific facts upon which to conclude that BOA's delegation of tasks to

Urban "made it easier to commit or conceal the fraud" or that BOA's association with

Urban gave the alleged enterprise more legitimacy than it otherwise would have

enjoyed.  *See Brannon*, 153 F.3d at 1148; *Fitzgerald*, 116 F.3d at 228.  The fact that

Urban employees were given titles and email addresses suggesting that they were BOA

employees belies any notion that BOA needed Urban to lend BOA the necessary

legitimacy to conduct a criminal enterprise.  *See* Docket No. 12 at 84, ¶ 250.  As noted

above, although plaintiffs allege that BOA directed Urban to carry out the mission of the

enterprise, plaintiffs fail to identify any factual allegations suggesting that Urban did

anything more than follow BOA's instructions, which does not indicate that Urban was

acting as anything other than an agent of BOA.

Finally, plaintiffs allege that the enterprise was also composed of Sykes

Enterprises, Inc., Wingspan Portfolio Advisors, Robertson Anschutz & Vetters,

Robertson Anschutz & Schneed, and Stewart Lender Services.  *Id.* at 48-49, ¶ 125.

However, the fact that BOA retained these entities to perform specific functions, without

more, does not evidence the existence of a RICO enterprise.  As such, plaintiff has

failed to show that BOA's association with those entities was anything more than an

22

agency relationship.  *See Fitzgerald*, 116 F.3d at 228.  In other words, there is no indication that, were BOA not to associate with the above-mentioned entities, its ability to carry out the allegedly unlawful goals of the enterprise would in any way be diminished.  Plaintiffs have therefore failed to allege that BOA was distinct from the alleged enterprise.  *See Liberty Grp.*, 965 F.2d at 885.

Plaintiffs rely on *Cedric Kushner Promotions v. King*, 533 U.S. 158 (2001), in support of their argument that BOA is distinct from the alleged enterprise, but such reliance is misplaced.  *King* held that, in certain circumstances, RICO liability can attach to a *corporate employee* when the employee unlawfully conducts the affairs of the corporation.  *Id.* at 166.  However, the Supreme Court specifically limited its discussion to cases where "a corporate employee is the 'person' and the corporation is the 'enterprise.'"  *Id.* at 164.  Here, unlike *King*, the RICO "person" is BOA, the corporation itself, and plaintiffs claim that BOA the corporation is separate from the enterprise – a scenario that *King* explicitly declined to address.  *Id.* at 164.[13]  As such, plaintiffs' argument that BOA's "actions were led by a group of mid-level executives," Docket No. 20 at 3, does not attach RICO liability to BOA's actions.  *See Liberty Grp.*, 965 F.2d at 886.[14]

---

[13]Contrary to plaintiffs' claim that *King* altered the applicable standard, the Supreme Court cited *Liberty Group* favorably in noting that "12 Courts of Appeals have interpreted the [RICO] statute as embodying some such distinctness requirement."  *Id.* at 162 (collecting cases).

[14]Plaintiffs' citation to *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545, 575-76 (D.V.I. 2004), is similarly unpersuasive.  The *Charleswell* court concluded that the defendants were distinct from the alleged RICO enterprise without analysis of the factual circumstances of their involvement in the enterprise.  *Id.*

Plaintiffs argue that the outside entities serving as BOA's agents should be considered functionally separate from BOA.  The relevant question, however, is whether plaintiff has alleged sufficient facts to conclude that the outside entities' conduct was used to facilitate the alleged enterprise's purpose as opposed to simply facilitating BOA's purpose.  BOA's use of outside entities to communicate with borrowers does not evidence that BOA is distinct from the alleged enterprise. Moreover, although plaintiffs allege that BOA used outside law firms to "facilitate foreclosures," plaintiffs fail to provide sufficient facts upon which to conclude that this conduct facilitated the enterprise's purpose as distinct from BOA's purpose.[15]  The Court also rejects plaintiffs' argument that non-exclusive agents of a corporation are, in all cases, distinct from the RICO person-corporation.  Docket No. 20 at 4.  Although this may be a relevant factual consideration, plaintiffs fail to identify relevant authority stating that non-exclusive agents of a RICO person-corporation are categorically distinct

---

[15]*Living Designs, Inc. v. Dupont de Nemours & Co.*, 431 F.3d 353, 362 (9th Cir. 2005), does not, as plaintiffs suggest, stand for the proposition that BOA divisions and executives are sufficiently distinct from the enterprise for RICO liability to attach to BOA. Rather, *Living Designs* held that a large corporation and its law firms retained for the purpose of defending the corporation in a lawsuit can be distinct from the corporation – the RICO "person" named in the amended complaint.  *Id.* at 361-62.  Although plaintiffs do not specifically argue this point, alleging that a law firm participated in the enterprise does not automatically, without more, make the enterprise distinct from the corporation that retained the law firm.  *See Walter v. Drayson*, 496 F. Supp. 2d 1162, 1166 (D. Haw. 2007) (citing *Living Designs* and rejecting RICO claim against law firms because complaint failed to allege that law firms operated or managed RICO enterprise or "did something more than act in a professional capacity").  As such, plaintiffs' allegations concerning the BOA-retained law firms are insufficient to show that the law firms acted outside their capacity as BOA agents in participating in the alleged RICO enterprise.

from that RICO person-corporation.[16]   The Court recognizes that outside agents of a

RICO person *can*, under some circumstances, be considered distinct from the RICO

person, but in the present case plaintiffs have failed to identify sufficient facts upon

which to conclude that the identified entities acted in furtherance of the enterprise

outside the scope of their agency with BOA.   *Cf. In re ClassicStar Mare Lease Litig.*,

727 F.3d 473, 493 (6th Cir. 2013) ("NELC's ostensible status as an independent third-

party lender was used to convince investors that ClassicStar's financing scheme was

legitimate").

For the foregoing reasons, plaintiffs have failed to state a RICO claim against

BOA.[17]

### B.  Promissory Estoppel

BOA argues that plaintiffs fail to state a claim for promissory estoppel.  In

Colorado,[18] the elements of a promissory estoppel claim are:

> (1) a promise which the promisor should reasonably expect to induce action
> or forbearance of a definite and substantial character on the part of the

---

[16]Plaintiffs' citation to *Gottstein v. Nat'l Ass'n for Self Employed*, 53 F. Supp. 2d 1212, 1220 (D. Kan. 1999), is inapposite for the reasons that BOA suggests, namely, unlike the present case, the court in *Gottstein* found that the enterprise itself was not an exclusive agent of one the enterprise's alleged members.

[17]The Court need not address BOA's or Urban's remaining arguments concerning plaintiffs' RICO claim.

[18]Plaintiffs assert that the law governing promissory estoppel claims in Alabama, Arizona, Arkansas, Colorado, Idaho, Kansas, Kentucky, Louisiana, Maine, Nebraska, Nevada, New Hampshire, New Mexico, Oregon, Pennsylvania, South Dakota, Washington, and Wisconsin is identical or substantially similar enough to allow plaintiffs to represent a class of borrowers.  Docket No. 12 at 92, ¶ 276.  Given plaintiffs' representation, the Court finds no compelling reason to apply the law of another jurisdiction and therefore will apply Colorado law to plaintiffs' promissory estoppel claim.

promisee; (2) action or forbearance inducted by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise.

*Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995).[19]

BOA argues that the TPP documents make no promises or representations that plaintiffs would be entitled to a permanent HAMP modification.  Docket No. 14 at 13. To sustain a claim for promissory estoppel, a plaintiff must establish that the statement or statements at issue were "sufficiently specific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms." *Watson v. Pub. Serv. Co. of Colo.*, 207 P.3d 860, 869 (Colo. App. 2008).  Although a promise may be stated in words or inferred from conduct, any such promise must be "clear and unambiguous." *G & A Land, LLC v. City of Brighton*, 233 P.3d 701, 704 (Colo. App. 2010).

Circuit courts considering promissory estoppel claims based in part on HAMP-related representations have come to different conclusions.  Some circuits hold that similar TPP document language constitutes a definite promise or obligation.  *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 566 (7th Cir. 2012) (finding allegations sufficient to show that "Wells Fargo made an unambiguous promise that if [plaintiff]

---

[19]BOA initially argued that the underlying TPP documents are formal agreements such that plaintiffs cannot maintain a promissory estoppel claim.  Docket No. 14 at 13. "Recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract." *Wheat Ridge Urban Renewal Authority v. Cornerstone Group XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007) (citing *Scott Co. of Cal. v. MK-Ferguson Co.*, 832 P.2d 1000, 1003 (Colo. App. 1992)).  However, plaintiffs respond that the amended complaint does not allege that the TPPs are enforceable agreements. Docket No. 20 at 12-13.  BOA appears to have abandoned its argument on this point. *See* Docket No. 22 at 8-10.

made timely payments and accurate representations during the trial period, she would receive an offer for a permanent loan modification"); *see also Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 884 (9th Cir. 2013) (holding that TPP document placed upon bank contractual obligation to promptly communicate HAMP eligibility determination to borrower and consider borrower for modification alternative); *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 234 (1st Cir. 2013) (holding that TPP document's contemplate that, if the borrower complies with its obligations, the lender will send the borrower a modification agreement).  Other circuits reach the opposite conclusion.  *See Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 440-441 (8th Cir. 2013) (finding that defendants' representations were too inconsistent as to be a definite promise); *Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548, 556 (5th Cir. 2012) (unpublished) ("Even the statement from the bank in January that she would be approved was still subject to maintaining the requirements of the TPP, including her inability to make payments on the loan; it was not an absolute guarantee."); *DeLuca v. Citimortgage*, 543 F. App'x 194, 197 (3d Cir. 2013) (unpublished) ("[T]hese documents, signed by the DeLucas to obtain a modification, specify that any offer for a permanent modification by Citimortgage was subject to qualifications.  This negated any assertion of their reasonable reliance."); *Miller v. Chase Home Finance, LLC*, 677 F.3d 1113, 1117 (11th Cir. 2012) (holding that plaintiff failed to state a claim that servicer promised to permanently modify the loan); *Bloch v. Wells Fargo Home Mortg.*, 755 F.3d 886, 889 (11th Cir. 2014) ("A letter stating that they *might* be eligible for a *trial* modification under

HAMP was not 'a binding promise' that the [borrowers] would receive a loan modification under HAMP." (emphasis in original)).

Plaintiffs' amended complaint alleges that "BOA, by way of its trial-payment agreements, made representations to Plaintiffs that if they made their trial payments and otherwise qualified for HAMP modifications, they would receive offers of permanent HAMP modifications."  Docket No. 12 at 92, ¶ 277.  The Court must therefore determine whether BOA's statements to each plaintiff rose to the level of a clear and unambiguous promise to that effect.

### 1. Mr. George

The letter that accompanied Mr. George's TPP document stated

> After you successfully complete your Trial Period Plan by making timely payments and returning the Trial Period Plan Agreement, we will send you additional documents.  These documents will include a Partial Claim and a Partial Claim and FHA-Home Affordable Modification Agreement that you will need to sign and return before your loan will be permanently modified.

Docket No. 12 at 64, ¶ 172.  Plaintiffs rely on these statements and the first paragraph of the TPP document that Mr. George signed, which contains similar language.  Docket No. 14-2 at 1.  Plaintiffs focus on the phrases "will send" and "will provide."  However, plaintiffs fail to account for the remainder of the document, which contemplates that BOA retains discretion to decline a modification request or, at the least, is entitled to discretion in determining whether the borrower has in fact complied with the agreement. *See Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013) (holding that, when document referenced in complaint is properly considered, "we examine the document itself, rather than the complaint's description of it").  For example, the TPP

document states that it "is not a modification of the Loan Documents and . . . the Loan documents will not be modified unless and until I meet all of the conditions required for modification, including signing the Modification Agreement and Partial Claim documents." *Id.* at 2. BOA "will not be obligated or bound to make any modification of the Loan Documents if [the borrower] fail[s] to meet any one of the requirements under this Plan," and "nothing in this Plan shall be understood or construed to be a modification, satisfaction or release in whole or in part of the obligations contained in the Loan Documents." *Id.* at 3. BOA's acceptance of a trial period payment is not "a waiver of, the acceleration of the loan or foreclosure action and related activities and shall not constitute a cure of my default." *Id.* at 2. The Court cannot conclude that the TPP document contained the clear and unambiguous promise that plaintiffs suggest. The TPP document states that the borrower must meet certain conditions and that the loan remains in full effect unless and until a permanent modification agreement is executed. See *Pennington*, 493 F. App'x at 556.

Even if the TPP constituted a promise to send the borrower a Partial Claim and Modification Agreement upon successful completion of the trial period, Mr. George received such documents on January 19, 2013. Docket No. 12 at 66, ¶ 179. Although this delay may have caused Mr. George significant hardship, the TPP contains no clear and unambiguous promise concerning when a permanent modification would be offered. In other words, the TPP does not promise that BOA will administer the HAMP program in a competent manner. Although plaintiff alleges that the TPP itself and BOA's website "indicated that Mr. George could expect a permanent modification within a month of the end of the trial period," *id.* at 65, ¶ 175, the TPP appears to contain no

such promise and plaintiffs' amended complaint does not include language from BOA's website to that effect.[20]  As such, the Court has no basis upon which to conclude that BOA made a clear and unambiguous promise to that effect.  Mr. George has failed to state a claim for promissory estoppel.  *See Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 522 (Colo. App. 2006) ("Fritzler's alleged statements are non-committal, whether considered in isolation or in the context of the parties' dealings").

### 2.  Mr. Dalton

According to the amended complaint, Mr. Dalton entered pre-foreclosure mediation with BOA and was placed on an "internal modification" plan.  Docket No. 12 at 73, ¶ 208.  The amended complaint contains no specific factual allegations concerning the statements contained within such a plan, yet makes clear that it not a HAMP TPP.  *Id.* ("This 'internal modification' was less advantageous than a HAMP modification.").  The amended complaint indicates that the second and third plans Mr. Dalton underwent also did not comply with HAMP and suggests that his trial plan may

---

[20]The amended complaint hints at the fact that HAMP regulations required an offer of permanent modification within a month of successful completion of the TPP.  *Id.* at 59, ¶ 151.  The allegation that the Treasury Department expected lenders to extend TPPs within 30 days of receipt of materials is not relevant to plaintiffs' promissory estoppel claim, which is based upon a failure to provide permanent modifications.  The amended complaint references the term Modification Effective Date, which is discussed in a footnote, stating "the anticipated Modification Effective Date is the first day of the month following the month when the last trial payment is due."  *Id.* at 18, ¶ 39 n.27 (citing www.hampadmin.com) (quotations omitted).  However, plaintiffs do not explain whether this is a regulation or an aspiration and, regardless, courts considering the question have held that HAMP does not create a private right of action.  *See, e.g.*, *Nelson v. Bank of Am., N.A.*, 446 F. App'x 158, 159 (11th Cir. 2011) (collecting cases).  The Court need not proceed further on this issue because plaintiffs' promissory estoppel claim does not appear based upon BOA's delay in providing a permanent modification, but, rather, on the BOA's complete failure to provide a permanent HAMP modification.

not have contained the same statements as those found in Mr. George's and the

Leavitts' TPPs. *Id.* at 74-75, ¶ 212, 216. Because the amended complaint does not

specifically allege the statements forming the basis of BOA's alleged promise, Mr.

Dalton has failed to state a claim for promissory estoppel.[21]

### 3. Mr. and Mrs. Leavitt

On March 30, 2012, the Leavitts received the TPP document. Docket No. 12 at

58, ¶ 148. The Leavitts' cover letter and TPP document contain substantially the same

statements as Mr. George's cover letter and TPP document. Thus, for the reasons

stated in regard to Mr. George, BOA did not make a clear and unambiguous promise

that the Leavitts would be given a permanent HAMP modification. *See Lund v.

CitiMortgage, Inc.*, 2011 WL 1873690, at *2 (D. Utah May 17, 2011) ("the HAMP Loan

Trial Agreement makes clear that it is not a loan modification and that any modification

would be contingent upon further approval"). Even if the TPP were construed as a

promise to provide a Partial Claim and Modification Agreement upon completion of the

trial period, in November 2012, the Leavitts received such documents. *Id.* at 59, ¶ 153.

As noted above, plaintiffs fail to sufficiently allege that the Leavitts were clearly

promised permanent modification documents within a specific time frame and the TPP

document did not clearly promise the Leavitts that HAMP would be administered to

---

[21]Although plaintiffs' promissory estoppel claims appear to be exclusively based on representations contained in the TPP and related documents, to the extent Mr. Dalton's promissory estoppel claim is based upon BOA's failure to provide a timely TPP, the amended complaint admits that Mr. Dalton received "conflicting information" from BOA that he was approved for a TPP and that some documents were missing. Docket No. 12 at 72, ¶ 205. As such, to the extent it is asserted, this aspect of his claim fails. *See Freitas*, 703 F.3d at 440-441.

them in an efficient or competent manner.  Thus, for the foregoing reasons, the Leavitts have failed to state a claim for promissory estoppel.

The amended complaint indicates that plaintiffs experienced immense disappointment, frustration, and even hardship as a result of their interactions with BOA and Urban.  However, plaintiffs' experiences do not state a RICO claim or promissory estoppel claim.  The Court will therefore grant BOA's and Urban's motions to dismiss.

## C.  Leave to Amend

Rule 15(a) of the Federal Rules of Civil Procedure instructs courts to "freely give leave [to amend] when justice so requires." *Id*.  Nevertheless, denying leave to amend is justified if the proposed amendments are unduly delayed, unduly prejudicial, futile, or sought in bad faith. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).  As a general rule, the Court retains the discretion to permit such amendments. *Minter v. Prime Equip. Co.,* 451 F.3d 1196, 1204 (10th Cir. 2006).  The Court must delineate its rationale if it refuses leave to amend. *Federal Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir. 1987).

Plaintiffs argue that they should be granted leave to amend for two reasons: (1) because defendants did not confer with plaintiffs before filing the present motions and (2) because BOA has refused to lift a protective order and grant plaintiffs access to documents and testimony produced in a related multi-district litigation case, *In re Bank of America HAMP Contract Litigation*, M.D.L. No. 2193-RWZ, currently pending in the District of Massachusetts.  Docket No. 19 at 14.  However, plaintiffs admit that they amended their amended complaint "following a brief conference with defense counsel"

and plaintiffs do not explain with any specificity what facts they hope to uncover if given access to the documents in the multi-district action.  The Court finds that it would be futile to give plaintiffs an opportunity to amend their RICO claims.  Plaintiffs have already amended their complaint to add allegations that other non-BOA entities were involved in the alleged RICO enterprise, amendments which, as noted above, were insufficient.  Plaintiffs do not specifically indicate how information produced as part of the multi-district action may be relevant to showing the degree and scope of Urban's discretion in carrying out BOA directives.  With regard to plaintiffs' promissory estoppel claim, there is no indication that any additional factual allegations would alter the fact that the TPP document does not contain the clear and unambiguous promise alleged as a basis for plaintiffs' promissory estoppel claim.  Thus, the Court will deny plaintiffs' request to amend their claims.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Urban's Motion to Dismiss the First Amended Class Action Complaint [Docket No. 13] is **GRANTED**.  It is further

**ORDERED** that BOA's Motion to Dismiss the First Amended Class Action Complaint [Docket No. 14] is **GRANTED**.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is dismissed in its entirety.

DATED September 30, 2014.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge